## Case No. 6,168a.

### HARTSHORN et al. v. TWENTY-FIVE CASES SILK.

[2 Betts, D. C. MS. 73.]

District Court, S. D. New York. Nov. 20, 1841.

SALVAGE—AMOUNT OF—DERELICT—POSSESSION OF GOODS SALVED—SERVICES OF SALVORS.

[1. A schooner of 64 tons burthen, loaded within six inches of the water's edge with a cargo of coal, and navigated by four persons, on her way out of Egg Harbor for New York, fell in with floating cases and boxes four or five miles from shore, and, by means of her yawl, in three hours picked up enough to load the schooner to her full capacity. Held, that the salvage service was not one of extraordinary merit, and an allowance should be made of one-fourth of the gross proceeds,—amounting to $12,583,—one-third of which to the schooner.]

[2. Salvors have a right to the possession of the salved property until their claims are legally adjusted.]

[3. A vessel which has picked up derelict goods at sea does not forfeit her salvage compensation by refusing to deliver them to the owner's agent at a small port into which she put because of adverse winds, and by carrying them to her port of destination, near by, where there was a better market.]

[This was a libel in rem by Robert H. Hartshorn and others against 25 cases of silks, for salvage. The Mutual Insurance Company appeared as claimant.]

BETTS, District Judge. A salvage service is never adjusted upon the mere consideration of a quantum meruit. Rowe v. The Brig [Case No. 12,093]; Coulon v. The Neptune [Id. 3,273]. The principles most essentially controlling the estimates of compensation awarded by admiralty courts are the broad interests of navigation and commerce subserved by salvors; the gallantry and good conduct of the party; the hazard he incurs; the peril from which the salved property is rescued, and the value of such property and degree of exposure and value of the vessel and her cargo employed in making the salvage. [Hobart v. Drogan] 10 Pet. [35 U. S.] 108; Tyson v. Prior [Case No. 14,319]; Rowe v. The Brig [supra]; Warder v. La Belle Creole [Case No. 17,165]; Clayton v. The Harmony [Id. 2,871]; Breevoor v. The Fair American [Id. 1,847]; Coulon v. The Neptune [supra]; 2 Hagg. Adm. 90; Holt, Shipp. c. 9. A scale of allowance advancing or receding through the influence of so many particulars, cannot be expected to supply any definite rule by which compensation can be measured with exactness or even uniformity, upon given state of facts. Two cases rarely arise with like ingredients throughout; and the court is constantly called upon to weigh and estimate the effect of circumstances existing distinct and separate from each other or combined particularly and in varying degrees and to judge how far the presence of some or one may still demand and appropriate the benefits of salvage service even of the most eminent degree. And it is generally found that the lesser in number the salvage qualities in the transaction, the greater is the tendency to influence and exaggerate those which it does present. To avoid the necessity of scrutinizing the qualities of the service minutely in each individual case, the courts have arrived at generalizing the allowance in cases of derelict,—those being of the most frequent occurrence,—and have been disposed to grant at first a third and more recently a moiety as the ordinary rate of allowance. Bond v. The Cora [Case No. 1,620]; Rowe v. The Brig [supra]; The Henry Ewbank [Case No. 6,376]. In some instances either becomes an extravagant compensation, in others a most trifling one; yet it is regarded on the whole as being better adapted to the objects in view than to have the matter without limitation and at the mere discretion of the court. A discretion that cannot be often applied with just discernment and discrimination, as it is to be exercised on proofs given by parties who are to receive according to the merits they ascribe to themselves and in respect to transactions foreign from the experience of the judge who is to decide upon them. Although, then, a third or a moiety be the amount more usually awarded for salvage in cases of derelict, it is manifest that the rate will rarely be adapted justly to any particular case, and it is accordingly sanctioned by the authorities, if not affording in a general view a reasonable approximation to the point, as at least supplying some degree of uniformity

of decision, and thus avoiding an incessant appeal to the courts in salvage cases. It has been the prevailing course of this court to allow a moiety in case of derelict, and only to increase it when the services have been eminently meritorious and the proceeds of the rescued property small, or to lessen it if the property saved was large in amount and the services of no extraordinary merit.

In this case the libellants consider. themselves entitled to at least two-thirds of the property saved, and urge that the allowance should be rated upon its gross proceeds. It does not strike me that they have succeeded in showing themselves entitled to such extraordinary reward, for such it would become by means of the value of the property saved. The representations of the state of the sea and the wind, if taken literally, no doubt make the enterprize a most hazardous and gallant one on their part, but, without collating all the proofs on this point, the facts, upon the libellants' own testimony, satisfy me that at the time and place their opinion of these particulars must have been far short of their representations of them. They were in a small schooner of 64 tons burthen, loaded to within 6 inches of the water's edge with a cargo of coal, and navigated by four persons. She put out from Egg Harbor, and was endeavoring to make her way to New York. She fell in with floating cases and boxes four or five miles from the shore, let down her boat, and was about three hours in picking up the goods. Two men were all the time absent with the boat, and once three, leaving but one with the vessel. During this period the schooner's sails were not lowered or altered, and the boat used was the common yawl of like vessels and, the boxes got on board weighed, some of them, 200 pounds. The facts demonstrate, to my judgment, that the state of the weather and of the sea could not have been of that boisterous and perilous character now represented; for, had it been so, the transaction throughout would have been one of most reckless rashness and desperation, and could scarcely fail, without miraculous protection, incurring the loss of the boat or schooner. if not both. I do not regard it as such. The libellants must be considered as acting under the expectation in view of circumstances as then existing that they could rescue the property without wanton exposure of themselves, and I am not disposed to believe they continued their efforts to save this property with any feeling or apprehension that their hazard was an extreme one, because, in the end. it does not appear they relinquished the adventure for any other cause than that they had laden the schooner to the extreme of her capacity. There is, then, in my opinion, nothing shown on the part of the libellants which could justify advancing the allowance in this case beyond a moiety.

Does the case made out by the claimants show that the allowance ought to be re-duced below that rate? The answer meets the claim to salvage on two grounds of defence: First, that the goods were picked up without danger or loss to the libellants, and with but little labor and delay; and, second, that they were brought into New York and there concealed by the libellants under circumstances taking away all equity to a salvage compensation. I think the claimants fail proving the alleged concealment. Upon all the testimony, I am satisfied the libellants conducted with good faith and with proper diligence and dispatch in having their claims adjusted after the goods were brought here, and that there was no concealment or misrepresentation with respect to them. Proofs were offered to establish improper conduct by the salvors at Egg Harbor after the goods were picked up; a refusal to deliver over or account for the goods to an agent of the master of the wrecked vessel, and a wrongful evasion to enter the goods there when requested by a custom-house officer. It is to be remarked, in respect to these matters of defence, that none of them are set up by the answer, and that the claimants have not therefore placed this branch of the case so before the court, that it can properly be taken cognizance of and adjudicated. I am not. however, inclined to consider this ground of defence of much weight, if the pleadings justified the admission of the proofs, and I should not accordingly delay the cause to allow adequate amendments for that purpose.

In so far as Willetts, the agent, sought for possession of the goods, it is manifest that the salvors were not bound to regard his demand. The law vested them with the right of possession until their salvage claims should be legally adjusted. He was allowed to take an account of all the goods on deck, and says Hartshorn told him these were all that were saved; but he did not ask to go below. Had he requested that privilege, and been refused, the circumstance might have been more strongly unfavorable to the salvors, and justified the demand of a clear explanation from them to avoid the implication of a fraudulent concealment of the property. It is evident that the salvors intended to avoid being detained at Absecon. Willetts was told, as soon as he came on board, that the property would be taken to New York, and the proper steps in regard to it be pursued there, and I do not think his testimony shows any improper interference or impediment on the part of Hartshorn to his obtaining an account of the goods on board the vessel, had that been declared as his sole object.

Whether the master of the Cephun was bound in law to enter his vessel at Egg Harbor is not a question arising in this enquiry. He may have violated his duty. under the revenue laws in that respect without affecting any way his good faith in respect to the disposition of the saved property. It is to be borne in mind that when the goods were picked up the vessel was on her way

to New York, and made the harbor only as a shelter, and because she could not make way against a head wind. Egg Harbor was not a port she entered for the purpose of unlading any portion of her cargo, or even refitting. Advantage was taken of it solely as a shelter from stress of weather. Willetts was no officer of that district, and the collector's office was twelve miles distant, and no imputation of fraudulent motive on the part of the salvors can be justly derived from their not seeking the collector or placing the goods under his authority. A reasonable excuse for not doing it is shown by the facts, and accordingly the failure to do it, if involving any consequence, will be that only of violating the revenue laws, and not that of acting with a wrongful purpose, in bringing the goods on to the port of destination of the vessel; that port being so directly in the vicinity, and better calculated as a place of sale to secure to the owners a fair value for the property. The courts would not sanction a wide deviation in a salvor vessel to seek a favorite port for the disposition of the salved property, but it would certainly not, as a presumption of law, impute a fraudulent motive in continuing and completing a voyage near its termination, although a nearer port might be at command of the vessel in which she could enter with the goods saved. I shall accordingly hold upon these proofs that the salvors did not, by bringing the property to the port of New York for adjudication, compromise their rights to a salvage compensation.

The remarks before made indicate the opinion of the court that the salvage service in this case was not one of great peril or difficulty, and that the essential merit consists in the value of the property saved. Not the usual peril attendant upon such transactions occurs here. The salvors did not visit the wreck for the purpose of rescuing life or the vessel itself. They merely picked up light articles floating upon the surface of the sea, and which accidentally fell across their path, without requiring any deviation or prolonged delay in their voyage. The service was valuable in the extreme to the owners, because the condition of the property was such as to ensure its immediate destruction but for the acts of the libellants, and for that reason the claimants of the property ought to make a liberal reward to those who rescued it. It produced in the whole $12,583.06. There seems to have been 51 cases of silk delivered by the salvors, and only 50 accounted for in the proceeds, and, as it will hardly be requisite to subject the case to an accounting at large before the clerk in respect to proceeds and charges, I shall assume the gross proceeds as the basis of the decree amounting to $12,583.06, without subjecting them to any abatement or account of charges. In 10 Pet. the court sanctioned the allowance of one-third of about $15,000 for salvage because the vessel was rescued, and great hardships

and exposures were incurred, and because it was not the habit of the court to vary on appeal the allowances made by the court below, except in flagrant cases of overvaluation of services. The reasoning of the court, however, very pointedly indicates that as an original adjustment a less sum could possibly have been adopted even in that case. In respect to the services performed, this case is greatly inferior to that, and essentially so in this, that the vessel is not saved, or any risk encountered in an effort to save her, or even to approach her when she foundered.

I shall accordingly decree the one-fourth part of the gross proceeds, being $3,145.76, for salvage in this case, and order costs to be paid out of the remaining three-fourths. The distribution of the salvage allowance to be:

| | |
|---|---:|
| To the schooner or her owners, one-third | $1,048 58 |
| Out of the residue, $2,097.18: | |
| One-third to Lee, the master | 699 06 |
| One-third to Hartshorn, the agent, &c. | 699 06 |
| One-sixth to Alfred Willetts | 349 53 |
| One-sixth to Arthur Lee | 349 53 |
| | $3,145 76 |

Robert H. Hartshorn is named agent in the process, but it is evident on all the pleadings that he had efficiently the command of the vessel, and the responsibility of her employment, and he is therefore placed on equal footing with the nominal master. The schooner is allowed to take the full rate usually allotted salving vessels, because the essential risk run in the adventure was the exposure and that of her cargo. The reward to the vessel for the degree of exposure incurred, and where there need be no forfeiture of her insurance, and the compensation for the very short period employed by her crew in this service, it seems to me, is thus made amply sufficient to subserve all those general principles conducing to the formation of salvage allowances, and also to be a meet contribution out of the large fund saved to the valuable and meritorious services which rescued and restored it to its owners. Decree accordingly.