William A. STANLEY, Plaintiff,

v.

ONETTA BOAT WORKS, INC., an Oregon corporation, Insurance Company of North America, a corporation, Union Insurance Society of Canton, Ltd., a corporation, Citizens Casualty Company of New York, a corporation, Defendants,

ONETTA BOAT WORKS, INC., an Oregon corporation, Third-Party Plaintiff,

v.

UNION INSURANCE SOCIETY OF CANTON, LTD., a Hong Kong corporation, and Northwest Marine Iron Works, a corporation, Third-Party Defendants.

Civ. No. 66–218.

United States District Court
D. Oregon.

June 30, 1969.

Alex L. Parks, Parks, Teiser & Morrell, Portland, Or., for plaintiff.

Don H. Marmaduke, Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., for defendant and third-party plaintiff.

Carl R. Neil, Krause, Lindsay & Nahstoll, Portland, Or., for defendants Insurance Co. of North America, Citizens Cas. Co. of New York and Union Ins. Society of Canton, Ltd.

Ben Lombard, Jr., Mautz, Souther, Spaulding, Kinsey & Williamson, Portland, Or., for third-party defendant Northwest Marine Iron Works.

Nathan J. Heath, Gray, Fredrickson & Heath, Portland, Or., for third-party defendant Union Insurance Society of Canton, Ltd. with regard to Builders Risk Policy of Insurance.

## OPINION

KILKENNY, District Judge:

Plaintiff seeks to recover damages against defendant Onetta Boat Works, Inc. (Onetta) for an alleged breach of a contract to construct and deliver to plaintiff a 57 foot steel hull fishing vessel. Plaintiff also seeks to recover from the three defendant insurance companies on the policies of hull and machinery insurance which those companies issued on the vessel and in which the plaintiff was named as the assured.

Onetta seeks relief against plaintiff in three counterclaims:

First, to foreclose a preferred ship mortgage given by plaintiff to Onetta to secure the payment of a promissory note in the sum of $17,592.89,

Second, to recover on an unsecured promissory note given by plaintiff to Onetta in the sum of $6,027.44, and

Third, to recover $1,879.10 on account of moneys allegedly advanced on plaintiff's behalf and on account of certain services, material and labor supplied by Onetta to plaintiff which Onetta claims were in excess of the requirements of the contract.

Onetta impleaded, and plaintiff cross-complained, against Union Insurance Society of Canton, Ltd. (Union Insurance) to recover on a builders risk insurance policy in which Onetta is named as the assured and plaintiff is named as a loss payee. Plaintiff also joined as defendants Citizens Casualty Company of New York (Citizens Casualty), Union Insurance and Insurance Company of North America (North America) to recover on policies of hull and machinery insurance issued by those companies to plaintiff on the vessel and in which Onetta is named as loss payee. Onetta cross-complained against the defendant hull insurers to recover on their policies.

In the third action, Stanley and defendant Onetta seek to recover from third party defendant Northwest Marine Iron Works (Northwest Marine), the plaintiff on a direct action, and defendant Onetta on a theory of indemnity in the event Onetta is held liable to plaintiff for part or all of the damages. Defendant insurance companies Union, North America and Citizens seek to recover from third-party defendant Northwest Marine on a theory of indemnity in the event they are held liable to plaintiff and to Onetta on the hull insurance policies which they issued to plaintiff. Said defendants also seek to recover from Onetta on a theory of indemnity in the event that they are held liable to plaintiff on the hull insurance policies and the loss was caused by the negligence of Onetta.

Defendant insurance companies North America, Citizens Casualty and Union Insurance paid into court on an *ex gratia* basis, without admitting liability, the sum of $3,100.00 on account of physical damage to the vessel hereafter mentioned in paragraph VII of the agreed facts. Defendant Union Insurance, with respect to its Builder's Risk Policy, contributed an additional $3,100.00 on an *ex gratia* basis, without admitting liability, to apply on physical damage to the vessel. Consequently, orders were entered dismissing defendant insurance companies North America, Citizens Casualty and Union Insurance only with respect to their liability, if any, on the policy of hull insurance issued by each company. Defendant Union In-

surance remains in the case as a third-party defendant with respect to liability, if any, relative to plaintiff's claim for loss of profits and Onetta's claim for indemnity in the event plaintiff recovers from Onetta with respect to loss of profits.

The parties concede diversity jurisdiction and additional jurisdiction pursuant to 46 U.S.C. § 951 and the Supplemental Rules for Certain Admiralty and Maritime Claims.

## AGREED FACTS

### I.

In October, 1964, plaintiff and Onetta entered into a written contract whereby Onetta, for a stated price, agreed to build for plaintiff a 57 foot steel hull fishing vessel (LYNN KENDALL) in accordance with plans and specifications prepared by naval architect Alfred Trachi. As part of the contract, plaintiff agreed to pay to Onetta the sum of $54,479.90 for the construction of the hull and the furnishing of such materials and the performance of such labor as was specified by the parties in their contract. Plaintiff agreed further that all other material, equipment or machinery and/or contract labor, purchased by Onetta upon the request and direction of plaintiff would be paid for by plaintiff at the net invoice cost to Onetta, plus 3%, and that any work ordered by plaintiff in addition to the work specified in the contract would be paid for at the rate of $7.00 per hour. Plaintiff and Onetta agreed that all sums due Onetta would be payable upon delivery of the boat to plaintiff. After plaintiff and Onetta entered into the contract, and during the construction of the vessel, numerous alterations and additions were made by Onetta at plaintiff's request whereby the contract work and materials were modified and extra charges were incurred.

### II.

By November 6, 1965, Onetta had presented to plaintiff invoices in the total amount of $92,285.56 and Onetta claimed that $37,805.66 of that amount was due and owing for extra equipment and labor performed and a certain advance made at plaintiff's request above and beyond the contract price of $54,479.90. Onetta demanded payment, or satisfactory arrangements therefor, of $31,-778.22 of such amount in addition to the basic contract price of $54,479.90 before delivery of the boat to plaintiff. After delivery of the boat, Onetta presented to plaintiff invoices for an additional $1,879.10 which it also claimed was due and payable.

### III.

On or about October 29, 1965, plaintiff paid Onetta the sum of $68,665.23 on account of the basic contract price and the additional charges claimed by Onetta, and plaintiff made and delivered to Onetta his promissory note for $17,592.89, with interest to accrue at 8% per annum from October 29, 1965. Contemporaneously, plaintiff executed and delivered to Onetta a preferred ship mortgage on the LYNN KENDALL to secure payment of the promissory note. Payments upon the note and mortgage were to be made in three equal installments of $5,864.29 on the 31st day of October, 1966, 1967, and 1968, and plaintiff agreed therein to pay reasonable attorneys' fees in any action to collect the note, or any portion thereof. The promissory note for $17,592.89 and preferred ship mortgage securing payment thereof were delivered to Onetta pursuant to the terms of a written agreement between plaintiff and Onetta, dated October 29, 1965. No payments have been made on the promissory note and mortgage although due demand for payment of the entire principal and interest has been made.

### IV.

On or about November 6, 1965, plaintiff, for a valuable consideration, made, executed and delivered to Onetta a promissory note dated November 1, 1965, by the terms of which plaintiff promised

to pay the principal sum of $6,027.44 to the order of Onetta 12 months after such date, with interest from November 1, 1965, payable at maturity at 8% per annum until paid. Plaintiff further promised as part of such promissory note to pay reasonable attorneys' fees awarded by the court in case action was instituted to collect the note. No payments have been made on this note although due demand therefor has been made.

## V.

Launching of the LYNN KENDALL was undertaken by Onetta at its boatyard in Portland, Oregon on October 18, 1965. At that time, there was in force Builders Risk Policy No. H–DB–636 which had been issued to Onetta by Union Insurance in which Onetta and plaintiff were named as the assureds and the sum insured was $90,000.00.

## VI.

On or about October 18, 1965, before delivery of the vessel to plaintiff and while the vessel was being launched by Onetta, a steel rail of the ways broke and the vessel fell onto and along the ways and grounded in the river as a result of which the vessel was damaged. Thereafter the vessel was delivered to Northwest Marine for repair work necessitated by the launching accident. While Northwest Marine was performing its repair work, Onetta also performed certain work in repair of damage caused by the launching accident. The charges made by Northwest Marine for its repairs amounted to $3,188.00 and the charges made by Onetta for its repairs amounted to $1,138.47. Union Insurance has paid these charges pursuant to the terms of its Builders Risk Policy. Delivery of the vessel was tendered and accepted in Portland, Oregon, on or about November 4, 1965, pursuant to the written agreement entered into between plaintiff and Onetta dated October 29, 1965. Although the vessel is currently in Alaskan waters, the parties expect that it will be returning to Oregon.

## VII.

Subsequent to accepting delivery as aforesaid, and on or about the 15th day of November, 1965, plaintiff and his crew departed Portland, Oregon, en route to Kodiak, Alaska. Between said date and February 10, 1966, cracks and faults appeared in the hull, machinery and fittings of said vessel, itemized as follows:

1. On or about November 21, 1965, while en route to Kodiak, Alaska, the expansion tank on the main engine began gaining water. On arrival at Juneau, Alaska, the vessel was drydocked where two cracks were found in the weld between the keel cooler and the hull plating forward of the stern post on the port side. A crack was also found on the starboard side approximately one foot forward of the stern post. Repairs were effected by welding.

2. En route to Kodiak, Alaska, from Juneau, Alaska, the expansion tank again started to overflow. On arrival in Kodiak, the vessel was drydocked where it was found that there were cracks in the same general vicinity as those repaired in Juneau and, in addition, that cracks had appeared in the forward bulkhead on the port side in the small crab tank, permitting Diesel fuel to leak through from the port tank in the double bottoms. A leak was also found where the bottom of the large crab tank joins the fuel tank on the port side, as well as a small hole in the base of the seine winch. The following day a crack was found in the weld in the bottom of the large crab tank, port side. Repairs were effected by welding and the vessel was put in fishing service.

3. On or about January 14, 1966, it was found that cracks had again appeared in the same general vicinity as the previously repaired

welds and additional cracks appeared which necessitated further drydocking. A crack was found near the center line in the weld near the after bulkhead of the large crab tank, and another crack approximately 4' forward of the after bulkhead on the starboard side of the center line. The keel cooler was also found to be leaking into the double bottom oil tank 4' forward of the after bulkhead on the port side of the center line. All cracks were welded and $\frac{1}{4}''$ x 3'' x 3'' angle irons were installed.

4. On or about February 4, 1966, the tail shaft slipped out of the coupling joint while the vessel was fishing off Alitak, Alaska. It was found that the nut securing the tail shaft flange to the tail shaft was not screwed on and that the tail shaft was not secured. Repairs were effected and on or about February 8, 1966, the vessel got underway from Alitak.

5. On February 9, 1966, the vessel's propeller fell off. She was towed back to Alitak and inspected where it was found that the propeller locking stud had been sheared off thus permitting the propeller to fall off. A new propeller was secured and the vessel was put back into service.

On all of the facts in the case, I have no difficulty in finding on the issues of liability:

(1) That Onetta should have completed construction and delivered the vessel by October 18, 1965. Although at the close of the testimony, I stated that the vessel should have been completed and ready to sail by October 1st, after a thorough review of the evidence, I find that defendants Onetta and Union Insurance are not liable for delay prior to the date of launching on October 18, 1965. The contract provided no specific completion date and I find that failure to deliver the motor, changes in and additions to the original contract and other factors beyond the control of Onetta, demonstrates that it should not be held responsible for delay prior to the date of launching. The evidence indicates that the vessel would probably have then ready to sail within 48 hours, but for the mishap. Consequently, plaintiff's claim for loss of damages for delay prior to the launching date is denied.

(2) That the preferred ship's mortgage and note were executed and delivered to Onetta without prejudice to plaintiff's claims for loss of profits due to delay in delivery and without prejudice to challenge the validity of the extras claimed and with a reservation of plaintiff's rights in connection with latent defects in the vessel not discoverable by reasonable inspection.

(3) That before accepting delivery, Onetta demanded that plaintiff execute a promissory note for $6,027.44. I find that said note was signed under duress in that the said vessel would not have been delivered unless plaintiff signed such note. Invoices for additional extras were presented to plaintiff on December 22, 1965.

(4) I find that Onetta is liable for the full cost of all damages reasonably flowing from the launching accident of October 18, 1965. However, it should be reimbursed to the extent to which the Builders Risk Policy of Union Insurance provides coverage.

(5) I find that Union Insurance assumed the responsibility for carrying out all required repairs after the launching accident and that it did so negligently and improperly. I find Union Insurance and Onetta primarily responsible for the unseaworthy condition of the vessel at the time she sailed for Alaska, about November 9th, and that the failure to properly repair such vessel, resulted in the vessel being drydocked at Juneau and emergency repairs effected by welding the cracks which were found in the stern section. The fault of the defendants resulted in further leaks which were discovered en route across the Gulf of Alaska from Juneau

to Kodiak, requiring further repairs which were effected at Kodiak. They were responsible when the vessel was put in drydock in Kodiak and extensive welding and repairs consummated. At that time, heavy angle iron stiffeners were welded in the way of the keel and in the interior. This, apparently, stopped the leaks.

(6) I further find that Onetta and Union Insurance were primarily responsible for the repairs and the delay in February, 1966, which was caused when the tailshaft parted and emergency repairs were effected at a cannery in Alitak and for the three days lost in March.

■ That plaintiff is entitled to recover all damages naturally flowing from the delivery to him of an unseaworthy vessel is beyond question. That Onetta was responsible for the mishap in launching is conceded. Likewise conceded, is the fact that Onetta's insurer Union Insurance engaged the services of the Surveyor who surveyed the damage resulting from the launching fiasco and gave the directions to Northwest Marine on the required repairs. The only evidence on the subject is that a repairman, such as Northwest Marine, is only required to do the repair job, as directed, in a good and workmanlike manner. Beyond a shadow of a doubt, the cracks and leaks in the vessel, which later developed were due to an unstable or faulty hull, with undue stresses and strains growing out of the launching, rather than a lack of good workmanship on the part of Northwest Marine.

■ Onetta's charges of negligence against Northwest Marine are: (1) failure to perform its repair contract in a workmanlike manner, in that it failed to properly test the repaired hull so as to determine whether it was completely water tight, and (2) failed to properly reassemble the tail shaft coupling so as to prevent it from working loose and damaging the propeller-locking stud. The evidence fails to support either one of these charges. For

that matter, the evidence preponderates in the opposite direction. As an afterthought, Onetta charges that Northwest Marine failed to follow the alleged instructions of the marine surveyor requiring that the tail shaft coupling be inspected both on drydock and in the water and that the coupling should not be put back together again until the vessel was in the water. Northwest Marine is not charged with this specification in the pre-trial order and I am bound by that order. Moreover, the evidence does not support this charge. Of significance, is the fact that no repairs were requested, or for that matter required or made, to the tail shaft coupling, and I so find. The shaft was checked for alignment. The tail shaft coupling was neither disassembled nor reassembled by Northwest Marine. I hold that Northwest Marine performed its contract in a good and workmanlike manner and that it is not responsible for any of the damage sustained by plaintiff. Northwest Marine is free from blame. There is no evidence on which the Court could make a finding that Northwest Marine, in its contract to repair, was required to test the alignment or design of the vessel. All of plaintiff's delay and heavy expense on the voyage to Kodiak was caused by the original unseaworthiness of the vessel resulting from the abortive launching. Onetta's and Union Insurance's cross-claims against Northwest Marine must fail for my stated reasons denying the plaintiff's claims against that defendant.

■ The evidence is clear cut that defendant Union Insurance assumed control of surveying the damage caused by the launching accident, determined the repair work necessary as a result of the accident and designated the party to accomplish the repairs. Moreover, said defendant failed to perform the duties which it assumed with reasonable care and as a direct and proximate result thereof, the vessel's hull was inadequately and improperly inspected, tested and repaired, and defendant Union Insurance is directly liable for any and all loss

or expense in connection with its failure to properly inspect, test and repair the said vessel after such launching incident. The liability under this finding is separate and distinct from Union Insurance's liability under its insurance contract, although the duty was assumed by reason of its responsibility under such contract.

## PLAINTIFF'S DAMAGES

I shall treat separately the items of damage claimed by plaintiff.

(1) Damages due to delay.

I find that the defendant Onetta is not liable for delay prior to the date of launching on October 18, 1965. Onetta was not required to deliver the vessel on any particular date and the evidence shows that it should not be held responsible for delay prior to the launching date, when it was ready to sail within 24 hours, but for the mishap. Consequently, plaintiff's claim for loss of damages for delay in completing the vessel is denied.

(2) Damages due to breakdowns of the vessel from launching date through March, 1966.

The record is undisputed that from the launching date to the date of sailing, which I hold to be November 12th, the vessel was being prepared for or in the process of being repaired by Northwest Marine and this delay was due to the fault of Onetta in launching the vessel.

The plaintiff's evidence, which I believe, makes it clear that the vessel could have been outfitted and ready for sailing on October 20th and he would have picked up his crab pots in Bellingham and foreseeably arrived in Kodiak on November 1st. If he had so arrived, there is evidence to indicate he would be in a position to immediately commence his fishing operation. As previously stated, the launching accident prevented the departure until November 12th. In place of reaching the fishing grounds on November 1st, the evidence clearly shows that about November

21st, the expansion tank on the main engine started gaining water. It was necessary to drydock the vessel at Juneau where cracks were found in the welds between the keel cooler and the hull plating on the port side. Another crack was found on the starboard side about one foot forward of the stern. After repairs were effected and the voyage was continued to Kodiak, the expansion tank again started to overflow and on arrival in Kodiak the vessel was again drydocked where it was found that there were cracks in the general area of those repaired in Juneau and additional cracks had appeared in the forward bulkhead on the port side of the small crab tank, permitting diesel oil to leak. After considerable time the repairs were effected by welding and the vessel put to sea. Subsequently, about January 14, 1966, other cracks appeared in the same general vicinity as the previous welds and additional cracks appeared which again necessitated drydocking. On the occasion of this repair, the hull of the vessel was reinforced by the installation of angle iron at strategic stress points.

A few days after returning to sea and on February 4, 1966, the tail shaft slipped out of the coupling joint. It was then determined that the nut securing the tail shaft flange to the tail shaft was not screwed and that the tail shaft was not secured. These repairs were not fully completed until February 8th. Later, on February 9th, on returning to sea, the vessel's propeller fell off. She was necessarily towed into Alitak where on inspection it was determined that the propeller locking stud had been sheared off, thus permitting the propeller to fall. A new propeller was secured and the vessel finally put back into service. I find that Onetta and Union Insurance are liable to the plaintiff for all these delays, and that each of the delays grew out of the unseaworthiness of the vessel at the time of delivery.

The evidence supports a finding that during the period in question, the plaintiff lost 70 fishing days from

November 1, 1965, through February, 1966, and three days in March, and that such loss is directly attributable to the unseaworthy condition of the vessel at the time of delivery.

■ It is undisputed that the 1965 King Crab season was the greatest in memory and that the superb catch ran well into the early months of 1966. The plaintiff's own catch during the periods when his vessel was not incapacitated requires a finding that the value of the use of his vessel was not less than $200.00 per day. This finding is supported by the records of catches of similar fishing vessels in the area during the same period of time and by the evidence in the record on the plaintiff's own catches. Plaintiff lost 70 days prime fishing due to the unseaworthiness of the vessel. At $200.00 a day, he is totally damaged in the sum of $14,000.00.

I am adopting the rule of loss of the use of the vessel as the measure of damage, because I feel the evidence on the loss of profits is on the shaky side. If I am in error on this issue, and the loss of profits is the measure of damage to be applied, Reefer Queen Co., Inc. v. Marine Construction & Design Co., Wash., 440 P.2d 448, 452 (1968), the evidence would support a damage award of $18,500.00 for loss of profits.

## INSURANCE COVERAGE

I have no difficulty in finding that defendant Union Insurance's policy covers this loss of Onetta.

Union Insurance insured Onetta against "all risk of physical loss of or damage to the subject matter hereby insured, except as hereinafter provided." Union claims that lost profits or damages for loss of the use or occupation of the vessel are outside the coverage of the policy by reason of the following exclusion: "Any consequential damages or loss through delay, however caused, * * *".

■ That the policy may have expired prior to the claim of loss, or the ascertainment of damages is, of course, of no consequence. "All Risk" insurance policies have been construed in many cases, including C. H. Leavell & Co. v. Fireman's Fund Ins. Co., 372 F.2d 784 (9th Cir. 1967), where it is said that such a policy creates a special type of coverage extending to risk not usually covered by other policies and that recovery under an "All Risk" policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a *specific provision*, expressly excluding the loss from coverage. Such a policy should be construed most favorably in favor of the assured. 88 A.L.R.2d § 6, p. 1130. Where the damage, such as here, is caused by the stresses and strains built into and enhanced by the launching mishap, such is not "consequential damage", but flows from the original defect at a later period of time. Leyland Shipping Co. Ltd. v. Norwich Union Fire Ins. Soc. Ltd. (1918, A.C. 350); Lanasa Fruit S. S. & Importing Co. v. Universal Ins. Co., 302 U.S. 556, 58 S.Ct. 371, 82 L.Ed. 422 (1938). Additionally, the language of an exclusion must be strictly construed against the insurance company. I-L Logging Co. v. Manufacturers & Wholesalers Indemnity Exchange, 202 Or. 277, 273 P.2d 212, 275 P.2d 226 (1954). Union Insurance's policy covers Onetta's loss.

## EXTRAS

The charges for some extras are conceded by the plaintiff.

■ One of the great difficulties is trying to separate the cost of materials and labor which truly represent extras, from those provided for under the basic contract at agreed prices. Although Onetta argues that the plaintiff made "a great many changes" during the course of construction, when the evidence is finally analyzed, plaintiff made very few substantial changes. Practically all changes were additions to the basic contract. There was a substitution of hydraulic steering for the old fashioned chain steering and a substitution of the electronic equipment which was

mentioned in the basic contract. Aluminum hatch covers were ordered rather than wooden hatch covers. As additions, the plaintiff ordered a reefer in the lazarette, a hydraulic seine winch, insulation, paneling in the forecastle, dimetcoting in the crab hold, four electric heaters in the pilot house and a work bench in the engine room. Of importance is the fact that Onetta wrote the contract. Consequently, it must be construed against the scrivener. For the sake of convenience, I shall dispose of the disputed items in the order set forth in plaintiff's final brief.

## HATCH COVERS

The evidence supports Onetta's claim to the extent of $525.97, after giving credit for $239.00, the cost of the original hatch.

## EXTRA BULKHEAD IN CRAB TANK

This, in my opinion, was the mistake of the designer. It should have been included in the original plans and specifications. The fact that this extra exceeded the original contract estimate of $500.00 is not plaintiff's fault. Onetta is bound by its contract.

In connection with sheet number 3, exhibit 9, this, too, grows out of additional crab tank charges. Outside of the charges for Dimetcote and the cost of application thereof, the evidence with reference to this extra is wholly satisfactory. However, it is evidence that extra labor and material was involved and I find that the sum of $350.00 is a reasonable sum to be allowed.

## HYDRAULICS

The claim is under sheet 5, exhibit 10. This total claim for extras is $4,674.90. One of the invoices covers a "crab block" at $1,450.00. The basic contract requires that a crab block be installed, along with other items at a stipulated price of $2,164.90. The alleged extra $1,450.00 cannot be allowed.

Likewise, the basic contract mentions a ground tackle with hydraulic anchor at an installed price of $1,000.00. It seems to me, and I find, that the installation of the anchor winch was part of the original contract and that this claim should not be allowed as an extra.

It is true that the hydraulic filters, valves and return elements installed in the vessel were larger and more costly than anticipated in the original contract. However, plaintiff is entitled to a credit on these extras of $150.50. The original items provided by the H. A. Thompson Company which were returned had a value of $80.54, the difference being $69.96.

Additionally, Onetta is entitled to recover as an extra the cost of the seine winch in the sum of $1,156.50.

## INSULATION

Sheet No. 16 (Exhibit 11).

Plaintiff concedes this extra in the sum of $380.62.

## OUTRIGGER POLES, ETC.

Sheet No. 7 (Exhibit 12).

It is my finding that Onetta is entitled to a credit as an extra in the sum of $1,144.75.

## FLOOR BOARD BRACKETS, ETC.

Sheet No. 9 (Exhibit 13).

Here, the plaintiff admits liability in the sum of $85.44. I believe there is an absence of proof beyond such figure. I find no supporting evidence for the claim of brackets for electronic equipment.

## ENGINE

Sheet No. 11 (Exhibit 14).

It is my finding that plaintiff is liable for the full amount of this claim in the sum of $11,772.64.

## ENGINE CONTROLS

Sheet No. 13 (Exhibit 25).

It seems rather clear that this alleged extra in the sum of $343.72 was covered by the basic contract.

## ELECTRONICS

It is my finding that plaintiff is liable only for the difference between the actual cost of the electronic equipment as eventually ordered in the sum of $8,470.29 and the contract price of the electronic equipment originally ordered at $5,830.00. In other words, Onetta failed to give the plaintiff credit for the cost as originally anticipated. Plaintiff is liable for $2,640.00 as an extra.

## JOINER LABOR AND MATERIAL

Sheet No. 15 (Exhibit 16).

It is my finding that the basic contract specifically mentioned and covered these items. $3,000.00 of that contract was set aside for this purpose. Plaintiff concedes that the installation of the refrigerator in the lazarette and a convertible slide out bunk in the captain's quarters, were extras. I find nothing in the record which would segregate the cost of these items from the items which were to be installed for the $3,000.00. Plaintiff has conceded up to $513.39 for these items and I find that said amount is reasonable, unless specific evidence is produced to show a greater cost.

## ELECTRICAL LABOR AND MATERIALS

Sheet No. 16 (Exhibit 11).

I hold that the basic contract covers this item and that Onetta can claim nothing as an extra, other than the cost of the heaters and the wiring conceded by plaintiff in the sum of $139.00.

## REEFER IN LAZARETTE

Sheet No. 18 (Exhibit 18).

This has already been covered under joiner labor and material.

## HYDRAULIC STEERING

Sheet No. 4 (Exhibit 19).

Under this heading, Onetta claims $908.98 as an extra charge. However, it fails to credit plaintiff with the $650.00, mentioned in the basic contract, for "steering shaft and chain, two stations". Consequently, this claim must be reduced to $258.98.

## RIGGING

Sheet No. 12 (Exhibit 20).

Although the invoices are difficult to analyze, I find that the charges which evidently were made for ground tackle were included in the basic contract, along with the hydraulic anchor winch. It is my finding that plaintiff is liable on this item in the sum of $650.00.

## POWER-HYDRAULIC STEERING

Sheet No. 17 (Exhibit 21).

I agree with plaintiff that it is impossible to distinguish between this item and the item headed "Hydraulic Steering" (Sheet No. 4, Exhibit 19). Onetta points to no evidence which would permit the allowance of this item.

## EXTRA MATERIAL & CASH

Sheet No. 19 (Exhibit 22).

This item is covered by the promissory note demanded by Onetta early in November, 1965, and supposedly covers Sheets 4, 12, 17 and 19. The evidence is rather clear that the note was extracted from the plaintiff under circumstances which challenge its validity. This exhibit is so enmeshed with the $6,027.44 promissory note that the claims must be considered as one. I find that plaintiff is liable on said note only for the sum of $2,280.95.

## HYDRAULIC MATERIAL & LABOR

Sheet No. 20 (Exhibit 26).

I agree with plaintiff that it is absolutely impossible for the court, or anyone else, to devise a method of separating this "hydraulic material and labor", referring to the hydraulic steering, a replacement from the chain steering, from the "Hydraulic Line and Fittings—$1,000.00", which was part of the basic contract. Many of the invoices have been duplicated, in whole or in part. The burden of proof was on Onetta to segregate these items and show by a

preponderance of the evidence what items were, in fact, "Extras". Where the evidence is in doubt, such as in this and on other items of claimed extras, the court must find against Onetta.

### EXTRA BILLING—DECEMBER 22, 1965

This invoice was submitted after the plaintiff reached Kodiak. Again, a failure of proof. Onetta has failed to sustain its burden and segregate the labor and material under the basic contract and the labor and material for the alleged extras. Many of the items claimed in this billing were covered by the basic contract.

In passing on all of these issues, I have carefully considered the testimony of Mr. Stokes. I was not at all impressed. He was unable to make a clear-cut distinction between items which were covered by the basic contract and items which might have been extras. The reason for his failure is rather obvious. Early in the construction of the vessel, Onetta started treating the construction on more or less of a cost-plus basis, rather than on the basis of conforming to the original contract and keeping a precise record on the extras involved.

Onetta's claim that there was a novation is without foundation and I so find.

### PLAINTIFF'S COUNTERCLAIMS FOR LABOR

The record is clear that the plaintiff and his engineer, Tony Ries, performed valuable services on the vessel as laborers, the plaintiff from the third week in July, 1965, through October 18th and his engineer from the early part of August, 1965, to October 18th. The work consisted of painting, sanding and other work in and around the vessel, generally known as jointer work. Although neither the plaintiff, nor his engineer, turned in "time cards", Onetta concedes that they performed valuable services in the construction of the vessel and in working on the vessel after the unfortunate launching incident. The record supports a finding that the plaintiff expended 325 hours of labor on the vessel and that the $3.00 per hour charge is a reasonable hourly charge for the labor performed. The total allowance in favor of plaintiff is $975.00. I find that Ries expended 225 hours of labor on the vessel and that $3.00 per hour is a reasonable hourly charge for the labor performed. The total allowance in favor of plaintiff for Ries' work is $675.00. A grand total allowance on these counterclaims in the sum of $1,650.00 is allowed. I allow nothing for living expenses.

Plaintiff is entitled to recover $2,500.-00 as reasonable attorney fees in connection with the prosecution of his claims against Onetta under the terms of the building contract.

I shall reserve ruling on attorney fees claimed on the mortgage foreclosure.

On those items which I have found to be valid extras, Onetta will be allowed interest at the rate of 6% per annum from November 12, 1965. Likewise, plaintiff will be allowed interest at the rate of 6% per annum from December 1, 1965, on the awards made for the value of the use and occupation of the vessel. Additionally, plaintiff will be allowed interest at the rate of 6% per annum from November 12, 1965, on his counterclaims for labor performed on the vessel. Of necessity, all dates for the commencement of interest are arbitrary.

If the amount owing on Onetta's mortgage and those extras which might not be included in the mortgage, exceed the counterclaims of plaintiff, then Onetta is entitled to a foreclosure of its mortgage. Otherwise, plaintiff is entitled to a judgment for the excess against Onetta and Union Insurance. Proper provisions shall be made in the proposed judgment for relief by Onetta against Union Insurance.

The foregoing shall constitute my findings and conclusions. Counsel for plaintiff and Onetta shall draft, serve and present a judgment in conformity herewith.