Charles WILLIAMS, Appellant and
Cross-Appellee,

v.

John E. ECKERT, Appellee and
Cross-Appellant.

Nos. 5378, 5410.

Supreme Court of Alaska.

April 30, 1982.

Richard J. Riordan, Jr., Bradbury, Bliss & Riordan, Inc., Anchorage, for appellant/cross-appellee.

Helen L. Simpson, Anchorage, for appellee/cross-appellant.

OPINION

Before RABINOWITZ, C. J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

CONNOR, Justice.

In this appeal Charles Williams challenges the propriety of the trial court's determination that he was liable to John Eckert for Eckert's loss of $16,000 net income from fishing. In response, Eckert contests a salvage award to Williams in the amount of $2,500.

I. FACTS

The controversy in this case centers around the actions of Eckert and his neph-

ew Williams after Eckert's vessel, the PEN–49, dragged anchor and ran aground in Metervik Bay in the Bristol Bay area of Alaska around May 18, 1979. Both Eckert and Williams were residents of Naknek, Alaska, and they had proceeded separately to Metervik Bay in order to fish herring. Metervik Bay is 100 miles due west of Naknek, between Dillingham and Togiak. The average running time from Naknek to Metervik Bay by boat is twelve to fifteen hours.

Because Eckert was somewhat physically disabled, he took a two-man crew instead of the normal one. The crew consisted of R. A. Williams, one of Charles Williams' brothers, and J. Bettis. Sometime during the middle of May, Eckert had established a shore camp at Metervik Bay, as the boat only had berths for two persons. During the evening of May 18th, a severe storm struck the region, with winds exceeding sixty miles per hour. The storm destroyed Eckert's shore camp. He thought of taking his skiff out when the high tide came in, but he gave up on this idea because of the roughness of the water.

In the morning, when the storm had abated, Eckert looked out to where his boat had been and saw that it was gone. A subsequent search revealed that the vessel was grounded on a gravel beach about one-half mile from what remained of Eckert's shore camp. A cursory examination of the vessel established that it had suffered no damage.

Because it was low tide when he approached the PEN–49, Eckert was able to board the boat. He fired up the engine and noted that it was working properly. He waited for the next high tide to come in, but, unfortunately, it did not reach far enough to refloat the vessel. Eckert then radioed the BLISTER, Williams' boat, in order to get assistance before the next high tide. Carl Williams, another of Charles' brothers, received the distress call and assured Eckert that help would be forthcoming. The PEN–49 could be seen from the BLISTER, which was anchored two miles away.

The help never arrived. Eckert recontacted the BLISTER, but was told that no assistance could be offered. Evidently, the BLISTER's anchor had become snagged on another boat's lost anchor. Not until much later that afternoon, after the expected high tide had come in and damaged the hull of the PEN–49 by shifting it against the rocks, did Charles Williams go to Eckert's aid.

When Charles Williams arrived, Eckert was at his shore camp. They had a short conversation, and Williams returned to his own camp, without having rendered any assistance. His brother, R. A. Williams, soon followed him, leaving Eckert with only one crew member, J. Bettis, when he began stripping the boat to prevent pilferage.

Eckert and Bettis spent the better part of the next two days stripping the boat of its electronic equipment: the power keel, the power roller, the bilge pump and the depth finder. When they finished, all that remained was the engine, some fishing nets and two anchors positioned to keep the boat from moving. Eckert had originally intended to have Bettis fly back to Naknek to get assistance, tools and equipment so that they could repair the boat. Unfortunately, although airplanes were coming in quite regularly, all of the available seats were taken. Williams had an airplane at the location and Eckert asked him if he could help out. Williams refused, however, stating that the plane had only two seats and that the other seat was already taken by his brother Carl, who had to catch a flight the next day to Los Angeles. Williams was seen flying out two or three times during the period of time that Eckert was stranded. When Williams returned from Naknek after delivering his brother, he brought back some of the supplies which were later used to repair the PEN–49.

Shortly after Eckert had completed taking his gear off, Williams approached the PEN–49 and began repairing its holes with scrap materials. The repair work was done by Williams, his brothers, Carl and Earl, and Dennis Herman. They spent the better part of one afternoon patching the boat,

after which Williams left to get some dinner at his camp. He stopped by Eckert's camp and spoke with him. When Eckert asked him once again if he could help out by at least taking some of his equipment to Naknek, Williams agreed. Williams, however, never told Eckert that he was repairing the PEN–49. Until he brought the boat back to Naknek, he did not discuss the issue of the boat with his uncle. Later that evening, Williams returned with his crew during high tide and succeeded in pulling the beached boat off the rocks. They ultimately took the vessel back to Williams' shore camp where they effected more extensive repairs over the next three days.

Eckert spent those three days in his camp trying unsuccessfully to get an airplane to fly him and his equipment out. During this time he became aware that Williams had taken possession of the boat. Eckert testified that he assumed that Williams was repairing his boat to help him out. He thought that Williams was going to surprise him by presenting him with the fixed PEN–49.

On May 29, 1979, Williams ran the PEN–49 back to Naknek under its own power. Later that day Williams stopped by Eckert's house. He informed him that he wanted either $4,200 as salvage, or the boat. Eckert claims that he offered Williams $1,000, but Williams denies that Eckert offered anything. When Williams declined to return the boat until the salvage was paid, Eckert contacted a local magistrate, who suggested that criminal charges be filed. Eckert then filed a criminal complaint. He accompanied the state trooper who served the complaint, but Williams refused to turn over the vessel. Allegedly, Williams also refused to grant Eckert the right to board the PEN–49 in order to view the extent of damage that the boat suffered or the amount of repairs that he had effected. Ultimately, the criminal complaint was dismissed by the prosecuting authorities.

On June 8, 1979, Eckert flew to Anchorage to secure counsel. He subsequently filed a claim and delivery action. A hearing was held on June 18, 1979. At that time, Eckert was required to post a $4,000 bond and the vessel was ordered released. He recovered the PEN–49 on or about June 22, 1979. Williams delivered the vessel to the cannery where Eckert worked so that it could be given permanent repairs. The repairs done by Williams had been satisfactory to get the boat to Naknek, but they were only temporary in nature. The repairs cost $700. Eckert did not get his boat back until the 30th of June. Due to the delays in the return of the PEN–49, Eckert missed the start of the salmon season and sought to recover his lost profits.

The trial court determined that it was not reasonable for Williams to have believed that Eckert was abandoning the PEN–49. The court found that Eckert did not abandon the PEN–49, and that Williams did not believe that he had done so. The court found that Williams was the salvor of the PEN–49 because the boat had been in maritime peril when he had voluntarily rendered successful assistance. Thus, the court concluded that Williams was entitled to compensation. The court found further that Williams was entitled to a salvage award in the amount of $2,500, and that Williams' out of pocket expenses for the salvage were between $80 and $120. But the court determined that because Williams did not return the PEN–49 to Eckert within a reasonable time, he was liable for $16,000 lost net income from fishing. Finally, the court found that Eckert was entitled to attorney's fees in the amount of $2,010, and costs.

On appeal Williams contends (1) that he had a lien for salvage which allowed him to retain possession of the vessel until either the lien was satisfied or a sufficient bond was posted to secure payment of the lien; (2) that the court erred in finding (a) that it was unreasonable for Williams to believe that Eckert had abandoned the vessel, (b) that Williams did not believe that the vessel was abandoned, and (c) that the vessel was not abandoned; (3) that there is no support in the record for the court's finding that Eckert lost income of $16,000 because Williams withheld possession of the vessel from Eckert; and (4) that attorney's fees are not

recoverable because this is a maritime action.

By cross-appeal Eckert asserts that it was error to award salvage to Williams: first, because Williams claimed the vessel as his own; second, because he unreasonably delayed in rendering assistance to the vessel; and third, because Williams detained the vessel beyond a reasonable time and in bad faith.

## II. THE SALVAGE LIEN

The trial court held that "Williams had a duty to return the PEN–49 as quickly as possible and any unreasonable holding of her was an act of conversion."

Williams cites a number of cases for the proposition that because he had a salvage lien he had the right to retain possession of the vessel until either the lien was satisfied or Eckert posted sufficient bond to allow for payment of the lien. He places principal reliance on *In re The Snow Maiden*, 159 F.Supp. 30 (D.Mass.1958); *The Hartshorn, et al. v. 25 Cases of Silk*, 11 F.Cas. 713 (S.D.N.Y.1841) (No. 6168A); *The La Bruce*, 14 F.Cas. 905 (Fla.Super.1837) (No. 7963); *Hightower v. Stillwell*, 179 Ark. 256, 15 S.W.2d 326 (1929). While each of these cases recognizes that a salvor does have a right of possession in a salvaged vessel, no case leaves this right unqualified.

■ A salvor can retain possession of a salvaged vessel until one of three events has occurred. As the court noted in *In re The Snow Maiden*, 159 F.Supp. at 33, while the salvor did not have a duty to immediately surrender the salvaged property to either its owner or the court, he would only be rightfully in possession of such property "until he was tendered the fair value of his services, or security therefor, or until a reasonable time for filing a libel *in rem* had expired." While the first two contingencies may be satisfied by the actions of the owner of the vessel, only the salvor can file a libel *in rem* against the vessel. Norris, in his comprehensive treatise on the law of sal-

vage, states essentially the same proposition. "The *salvor must* move with reasonable dispatch to either *arrange for payment or security or to libel the property* for the purpose of an eventual court sale." M. Norris, The Law of Salvage, § 151 at 249 (1958) (emphasis added).

■ Under maritime law a salvor cannot hold possession of the saved vessel indefinitely, to the prejudice of the owner. He must take affirmative action within a reasonable time to enforce his lien. What is reasonable must, inevitably, turn on the particular circumstances of the case.

There may well be cases when a relatively long period of detention is warranted before judicial enforcement of the lien is initiated. For example, such might be the case where a vessel is saved far from its home port, or where the salvor has difficulty getting in touch with the owner, or where the owner's desires concerning disposition of the vessel are vague or indefinite, or where the salvor has difficulty in securing counsel to bring an action *in rem* against the vessel.

■ The circumstances in the case at bar are quite different. Williams resisted Eckert's right to possession of the vessel and would not let Eckert go aboard the vessel to examine the extent of the damage or repairs. Being a fisherman himself, Williams apparently knew of the imminent salmon fishing season and of Eckert's need to have the vessel for the salmon season. Yet Williams took no action to enforce his maritime lien. In these circumstances we agree with the trial judge that Williams' conduct was unreasonable, and that it caused loss to Eckert.

On the other hand, we do not view Williams' misconduct to be so serious as to require total forfeiture of the award. It is apparent that the trial court considered the relevant factors in arriving at the amount of the salvage award in this case. We will not disturb that award on appeal.[1]

---

1. Norris, Misconduct of Salvors, 18 Brooklyn L.Rev. 247, 249 (1952), states the applicable factors:

"The amount of the award in a salvage case is influenced largely by the presence or

## III. ABANDONMENT

Williams asserts that the trial court's findings concerning abandonment were clearly erroneous. It will be recalled that the court found that Eckert had not abandoned the vessel, that it was unreasonable for Williams to believe that Eckert had abandoned the vessel, and that Williams did not believe that Eckert had abandoned it.

The thrust of the argument seems to be that Williams, reasonably believing the vessel to be abandoned, had a possessory lien on it. As we have stated earlier in this opinion, it is apparent that Williams, as a salvor, had a maritime lien on the vessel. The question germane to this case is not the existence of the lien but whether the period of detention by Williams was reasonable. The question of abandonment is, therefore, irrelevant to the outcome of this appeal. We need not consider the point further.[2]

## IV. LOST INCOME

Williams next alleges that there was an inadequate factual record to support the trial court's determination that Williams' withholding of the PEN–49 caused Eckert to lose $16,000 of net fishing income. He argues that the dearth of evidence in the record relative to this point prevents such damages from being ascertained with reasonable certainty. Eckert argues that there was adequate support in the record for a finding that he suffered $16,000 damages for the loss of use of his vessel.

The following evidence regarding Eckert's lost income was presented to the court. Eckert filed the present claim and delivery action on June 8, 1979, and pursu-

ant to an order for release of the vessel recovered the PEN–49 on or about June 22, 1979. He had the vessel repaired at a local cannery, got it back on June 30, 1979, and began fishing July 1, 1979. He further testified that "everybody starts fishing approximately around the 15th of June," and had his boat been repaired in time, he could have gone fishing on the 15th of June.

Eckert further testified that between July 1, 1979 and July 19, 1979 he only fished ten or eleven fishing periods because, after July 1, the canneries were glutted. He testified that during this period of salmon fishing he grossed $17,000. After his expenses and his partners' shares were deducted, his take was about $10,000.

It is a well established principle of maritime law that lost fishing profits can be recovered. *Jones v. Bender Welding and Machine Works, Inc.*, 581 F.2d 1331, 1337 (9th Cir. 1978). The U. S. Supreme Court stated in an early and frequently cited case:

> "That the loss of profits or of the use of a vessel pending repairs, or other detention, arising from a collision, or other maritime tort, and commonly spoken of as demurrage, is a proper element of damage, is too well settled both in England and America to be open to question. It is equally well settled ... that demurrage will only be allowed when profits have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits is proved with reasonable certainty."

*The Conqueror*, 166 U.S. 110, 125, 17 S.Ct. 510, 516, 41 L.Ed. 937, 944 (1896). Similar-

---

absence of good faith on the part of those who claim it. Just as the good conduct of salvors—and their skill, promptitude, courage and energy—will according to the degree in which these qualities are displayed enhance the claim to a liberal salvage award, so will serious misconduct on their part lead to an entire forfeiture, or at least a reduction, of the award. The equity rule that the party who seeks aid must come in with clean hands, has particular application in salvage actions." (footnotes omitted).

**2.** Abandonment might be important if there were a claim that the owner of the vessel had

relinquished both possession and ownership and that the person taking it into possession thereby became the owner. But we do not read Williams' argument as so contending.

In general, a vessel is subject to salvage when it is at risk from a maritime peril, but an owner or owner's agent can remain in possession and refuse unwelcome offers of salvage. G. Gilmore & C. Black, The Law of Admiralty, 535–36 (2d ed. 1975). In that sense a physical "abandonment" of the vessel can have legal significance, although even this rule may be subject to exception in certain instances. *Id.*, 536 n.12.

ly, a number of cases have applied, or by implication recognized, the rule that in a replevin action loss of profits resulting from the wrongful detention of property may be recovered where they can be estimated with a reasonable degree of accuracy. *See* Annot; 48 A.L.R.2d 1053 (1956); Restatement (Second) of Torts § 931 (1979).

Other courts in dealing with lost fishing profits have recognized the impossibility of mathematical precision in calculating such an award. In *Reefer Queen Co. v. Marine Construction and Design Company*, the court acknowledged:

> "A measuring stick, whereby damages may be assessed within the demarcation of reasonable certainty, is sometimes difficult to find. Plaintiff must produce the best evidence available and ... if it is sufficient to afford a reasonable basis for estimating his loss, he is not to be denied a . substantial recovery because the amount of the damage is incapable of exact ascertainment."

73 Wash.2d 774, 440 P.2d 448, 452–53 (1968), *quoting Larsen v. Walton Plywood Co., Inc.,* 65 Wash.2d 1, 390 P.2d 677, 687 (1964). In *Miller Industries, Inc. v. Caterpillar Tractor Co.,* 473 F.Supp. 1147, 1156 (S.D.Ala.1979), the court stated that although damages for lost fishing profits must be proved with reasonable certainty, this does not prevent the court from "establishing the amount and value of the catch lost by plaintiff on the basis of such evidence as might reasonably be expected to be available under the circumstances." In *Stanley v. Onetta Boat Works, Inc.,* 303 F.Supp. 99 (D.Or.1969), the court used the plaintiff's catches during the period preceding its lost time to estimate its losses:

> "The *plaintiff's own catch* during the periods when his vessel was not incapacitated *requires a finding* that the value of the use of his vessel was not less than $200.00 per day. This finding is *supported by* the records of catches of similar fishing vessels in the area during the same period of time and by the evidence in the record on the plaintiff's own catches." (emphasis added).

*Id.* at 106.

■ We have previously stated that while an award of lost profits cannot stand if it is the result of mere speculation, it is not necessary to prove it with exactness, so long as actual loss of profits is shown and there is a reasonable basis upon which to compute an award. *City of Whittier v. Whittier Fuel & Marine Corp.,* 577 P.2d 216, 222 (Alaska 1978). We hold that the testimony of Eckert relative to the subsequent fishing periods, his gross profits, his net profits, and the prevailing conditions provided sufficient competent evidence to sustain the trial court's determination of damages. While the evidence here may be sparse, and evidence as to other catches in the area during the same time might have been helpful, we cannot say that the damages here are uncertain just because they cannot be exactly calculated.

Undeniably, Williams' actions caused Eckert to lose some money. Other courts have recognized the justness of a liberal approach to estimating loss of profits where the difficulty in proving their amount is directly caused by the defendant's wrongdoing. In *Pacific Steam Whaling Co. v. Alaska Packers' Ass'n,* 138 Cal. 632, 72 P. 161 (1903), the defendants had wrongfully excluded the plaintiff from fishing salmon off the coast of Alaska. The jury determined that the plaintiff had suffered $14,000 in lost fishing profits, based upon the amount of fish the defendants had taken from the area and the testimony of the plaintiff as to the amount of fish it thought it would have caught had it not been for the defendants' actions. The court in sustaining the damage award stated:

> "With respect to this kind of damage, of course, there cannot be the absolute certainty possible in many plainer cases; but a wrongdoer cannot entirely escape the consequences of his unlawful acts merely on account of the difficulty of proving damages. He can do so only where there is no possibility of a reasonably proximate estimation of such damages, which is not the fact in the case at bar."

*Id.* 72 P. at 163. There is a possibility of a reasonably proximate estimation in the case before us. The evidence proffered by Eckert provided a reasonable basis for the trial court to compute the damages incurred as a result of Williams' wrongful detention of the PEN–49, and the award is therefore sustained.

## V. ATTORNEY'S FEES

Williams asserts two main reasons why the award of attorney's fees in this case was improper. First, he insists that it is the general rule that attorney's fees are not awarded to the prevailing party in admiralty. Second, he argues that because both Congress and the federal courts have vigorously pursued uniform national application of admiralty law, affirming the award would tend to disrupt that goal.

However, 28 U.S.C. § 1333 (1948), the federal statute which governs admiralty jurisdiction, states:

> "The district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled ..."[3]

██ Eckert sued in state court to recover his vessel. One of the remedial adjuncts of that suit was the right to recover attorney's fees under Alaska Civil Rule 82, if he prevailed. Congress has not prohibited such an award in state actions arising out of the admiralty jurisdiction of the United States. Moreover, an award of attorney's fees in a state court does not frustrate or displace the essential features of substantive maritime law. It is merely remedial in nature.[4]

We hold that the award of attorney's fees under Alaska Civil Rule 82 was proper.

AFFIRMED.

---

**3.** From the enactment of the Judiciary Act of 1789 until an amendment in 1948, this saving clause read: "saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it." Act of Sept. 24, 1789, ch. 20 § 8, 1 Stat. 76.

**4.** Similarly, while jury trials are unknown in admiralty, they are not prohibited in state court actions based upon a maritime cause. *See Lavergne v. Western Company of North America, Inc.,* 371 So.2d 807, 810 (La.1979). *See also Fitzgerald v. United States Lines Co.,* 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963).