Minnie **BRECHT**, Respondent,

v.

Viona **SCHRAMM**, Appellant.

No. 47519.

Supreme Court of Minnesota.

May 5, 1978.

John E. Mack, New London, for appellant.

Smith, Hendricksen & Theis, Glencoe, for respondent.

Heard before PETERSON, KELLY, and IRVINE, JJ., and considered and decided by the court en banc.

L. J. IRVINE, Justice.*

Plaintiff, Minnie Brecht, and defendant, Viona Schramm, were aunt and niece, respectively. Minnie and her husband, Adolph, were childless. In 1964, Adolph's eyesight was failing badly, and Viona, at Minnie's request, began to furnish transportation to Minnie and Adolph, taking them shopping and to church. When Adolph died in May 1965, Viona made most of the funeral arrangements, and thereafter, she continued to run errands for Minnie and to furnish transportation for her. She also visited Minnie, sometimes at Minnie's request. Viona's testimony is conflicting as to whether or not she expected to be paid for these services.[1]

Early in 1971, a change took place in the situation between the two women. In November 1970, Minnie had been found unconscious in her home and had been taken to the hospital in Glencoe. In January 1971, she was moved to the Glenhaven Rest Home (Glenhaven), also in Glencoe. An administrator at Glenhaven suggested that it would be well for Viona to secure a power of attorney from Minnie so that Glenhaven would be certain of being paid. Viona discussed this with Minnie, who sent her to Hubert G. Smith, an attorney in Glencoe, to have such a document drafted. Minnie signed the document on January 22, 1971.[2]

After receiving the power of attorney, Viona almost completely took over the handling of Minnie's business and personal affairs. Minnie had savings accounts or certificates of deposit in banks and savings institutions in Glencoe and Hutchinson. She also kept an undetermined amount of cash in a strongbox at home. Viona used the cash and drew on the bank accounts as necessary to pay Minnie's bills. She also cashed Minnie's social security checks.

Minnie continued to have health problems, and she divided her time between her home in Glencoe, the hospital, and Glenhaven until February 1973. At that time, she entered the Golden Age Rest Home, also located in Glencoe, where she remained until March 1, 1975. During this time, Viona either visited Minnie or checked on her three or four times per week. Using her power of attorney, Viona paid the charges at the hospital and at the rest homes, the final cost at Golden Age Rest Home being $325 per month for room, board, and incidentals. Viona also looked after Minnie's house and either did the work herself or hired someone else to do it.

Viona apparently first indicated to Minnie in August 1971, that she would like to be compensated for her services. Minnie told Viona to "go to Smith and have something drawn up," which Viona did. Mr. Smith composed a document, in the form of

---

* Acting as Justice of the Supreme Court by appointment pursuant to Minn.Const. art. 6, § 2, and Minn.St. 2.724, subd. 2.

1. At one point during cross-examination, Viona said that she did not intend to be paid for services performed in the early years; later during cross-examination she stated that she did intend to be compensated but that she did not tell anyone except her lawyer, Mr. Arnold Beneke.

2. Actually, there were two powers of attorney drafted. Minnie's signature on the first one was not notarized and a bank in Hutchinson would not honor it. Therefore, a second one was drafted and was properly executed on January 22, 1971.

a letter from Minnie to Viona, in which Minnie acknowledged that Viona had performed services for her since 1964 and assured Viona that she would be paid for her services from Minnie's estate. Minnie also requested that Viona continue to act as her business agent and to furnish transportation for her, payment for which would also come from Minnie's estate. The letter was dated August 27, 1971, and was signed by Minnie in the presence of a witness. In November 1971, Viona took Minnie to the law office of Smith and Hendricksen in Glencoe, where a new will was drafted for Minnie. The will supposedly made provision for Viona in accordance with the letter of August 27, 1971, although at the time of trial the will could not be found.

In August 1973, Viona, who said she was "getting poor" taking care of Minnie's house, took $1,500 of Minnie's funds for herself with the consent of Minnie and one of Minnie's attorneys, Harald Hendricksen. Mr. Hendricksen also authorized Viona to have a new roof put on Minnie's house, to have it painted, and to make other repairs.

In 1974, Minnie began to be very unhappy with the Golden Age Rest Home, and she asked Viona to take her out of there. Viona suggested several other rest homes in various locations, including Glenhaven, however, none of these was satisfactory to Minnie. After several months of being importuned by Minnie, Viona finally suggested that Minnie come to the farm home 8 miles from Glencoe which was shared by Viona, her husband, and her mother. This suggestion was acceptable to Minnie. Viona said she wanted to be paid for room and board and, according to Viona, Minnie offered to pay her $1,000 a month if she would only get her out of the rest home.

On March 1, 1975, Minnie left the Golden Age Rest Home and went to live with Viona. Viona testified that she actually charged Minnie $600 per month for room and board. Shortly after arriving at the Schramm home, Minnie started talking about selling her house. Viona testified that she "jokingly" had suggested that Minnie give her the house "in payment of my work." After considering and discarding the possibility of placing the house in the names of both of them, Minnie finally agreed to give the house to Viona.

Soon thereafter, Viona went to see her attorney, Arnold Beneke. Mr. Beneke drafted a deed conveying Minnie's house in Glencoe to Viona. He also drafted an agreement which recited the conveyance to Viona of Minnie's house having a value of $15,800 and that services were rendered in the past by Viona to Minnie. The agreement further stated:

"WHEREAS Second Party [Minnie] desires to have First Party [Viona] continue to render services and furnish matters as hereinafter stated.

"NOW THEREFORE, in consideration of all of the foregoing, the covenants and agreements herein contained, in consideration of love and affection and for other valuable consideration including the said services, etc. heretofore rendered by First Party to Second Party at Second Party's request, IT IS AGREED by and between the parties hereto as follows:

"1. As stated, Second Party has conveyed by even date herewith [sic] the above described premises to First Party.

"2. First Party shall furnish to Second Party transportation free of charge for the purposes of Second Party attending church regularly, shopping and visiting friends and relatives in the State of Minnesota so long as Second Party resides in First Party's home.

"3. In the event that Second Party is required to or elects to reside in a rest or nursing home or other place than at First Party's home, First Party agrees that she will regularly visit Second Party and will furnish Second Party transportation as above mentioned and will otherwise look after Second Party and will check to see that Second Party is properly taken care of while Second Party is in any said nursing home, rest home or other place of residence, for so long as Second Party lives."

Both the deed and the agreement were dated April 16, 1975. They were taken to

the Schramm home on that date by Doris Heil, Mr. Beneke's secretary. Mrs. Heil testified that she first handed the agreement to Minnie, who read and signed it, and then the deed, which Minnie also signed. The only discussion that took place concerned the value of the house, which Minnie thought was much too low. Both Mrs. Heil and Viona explained to her that the figure was taken from the tax statement.[3] Minnie never talked to Mr. Beneke or to her own attorney about the documents before signing them.

Minnie seemed to be reasonably happy in Viona's home until about July 3, 1975, when Viona suggested that perhaps Minnie should pay for room and board. This offended Minnie, who thought that the gift of her house was sufficient payment for both past and future services. Viona backed off immediately and agreed to furnish room and board, but Minnie would not be placated and she called her grandniece, Eldonna Soeffker, who took Minnie to her home on July 5, 1975. Minnie immediately revoked Viona's power of attorney and on August 20, 1975, she commenced this lawsuit. At the time of trial, Minnie was 79 years old.

In her complaint, Minnie alleged undue influence; her own mental incompetence at the time of executing the agreement of April 16, 1975; lack of consideration for that agreement; fraud on the part of Viona; and failure of Viona to account for funds belonging to Minnie. She sought an accounting from Viona; damages for all amounts for which Viona could not account; an order rescinding the agreement of April 16, 1975, and cancelling the deed of that date or, in the alternative, an order requiring Viona to convey to Minnie a life estate in the house. Viona interposed an answer and a counterclaim in which she requested that Minnie be required to carry out the terms of the agreement of April 16, 1975, or, in the alternative, that Minnie be required to pay Viona $33,000, the value of Viona's services.

Because of later developments, dates become important. The case was tried to the court without a jury, commencing on December 2, and ending on December 4, 1975. Briefs were to be filed by December 22, but the clerk's file indicates that briefs were still being filed in February 1976. On March 26, 1976, the trial judge filed his findings of fact, conclusions of law, and order for judgment, dated March 23, 1976. There was no stay of entry of judgment, and judgment was entered on March 26, 1976.

The trial court found, inter alia:

"5. That at the time plaintiff conveyed her real property by deed she was of sound mind and competent to dispose of her property.

"6. That the Agreement executed by the parties on April 16, 1975, does not embody the actual agreement of the parties. That plaintiff was mistaken as to the terms of this written agreement. That the written agreement was prepared by defendant's agent. That either defendant also was mistaken as to its terms or defendant, if she was not so mistaken, failed to disclose to plaintiff the actual terms.

"7. That during the period defendant acted as plaintiff's attorney in fact, defendant expended cash in a strong box at plaintiff's home, cash in plaintiff's bank accounts totalling approximately $28,500.00, the interest earned on these accounts, and plaintiff's income from social security benefits. That plaintiff demanded an accounting of these funds but defendant is unable or refuses to render an accounting.

"8. That the reasonable amount for the support and maintenance of plaintiff is $400.00 per month. That the life expectancy of plaintiff is 7.6 years. That the present value of an annuity of $400.00 per month for 7.6 years at the rate of 6% discount is $28,600.00."

---

3. The only other evidence of the value of the house was the testimony of Gilbert Soeffker, a contractor, that it was worth $27,000.

The court concluded that Minnie was entitled to an accounting from Viona; that the agreement dated April 16, 1975, did not embody the actual agreement of the parties and that Minnie was entitled to equitable relief; that Minnie was of sound mind and competent at the time she conveyed her property to Viona; that Viona was entitled to compensation for her services to Minnie but that she had been paid in full; and that Minnie was entitled to an award of support and maintenance from Viona in the amount of $28,600.

The trial court entered an order for judgment appointing a referee to prepare and file an accounting for the period from January 22, 1971, to July 5, 1975; denying Minnie's request for rescission of the deed dated April 16, 1975; and awarding judgment to Minnie in the amount of $28,600.

On March 30, 1976, Minnie served on Viona notice of the filing of the court's findings of fact, conclusions of law, and order for judgment for the purpose of limiting the time for appeal. On the same date, Viona served a notice of motion and motion on Minnie asking for a remittitur or for amended findings of fact, conclusions of law, and order for judgment, or for a new trial. The motion was set for hearing on April 9, 1976. On June 18, 1976, no report having as yet been received from the referee concerning the accounting, the trial court entered an order vacating the judgment entered on March 26, 1976. This was done at the request of Viona, and over the objection of Minnie, in order to prevent the expiration of the time for appeal. In October 1976, the referee filed his report of the accounting between Minnie and Viona. In the meantime, on August 1, 1976, Minnie died.

On December 30, 1976, the trial court filed what were labeled as "amended findings of fact, conclusions of law, and order for judgment," dated December 21, 1976, which otherwise contained no reference to the original findings, conclusions, and order. Some of the findings were identical to the original, but others were significantly different, e. g.:

"6. That the Agreement executed by the parties on April 16, 1975, does not embody the said oral agreement of the parties. That the written agreement was prepared by defendant's agent. That plaintiff was mistaken as to the terms of this written agreement.

"7. That either defendant also was mistaken as to the terms of said 'written' agreement or, if she was not so mistaken, failed to disclose to plaintiff the actual terms and procured by undue influence the plaintiff's conveyance by said deed.

"8. That the conveyance from plaintiff to defendant was without adequate consideration and improvident."

After referring to the accounting between the parties, the court found as follows:

"12. That how the balance ($24,372.98 minus $16,088.87) in the sum of $8,284.11 was expended by defendant is not possible to establish due to defendant's lack of records. That defendant did expend by cash payment on behalf of plaintiff some sums for other miscellaneous items and that [$8,284.11] is the reasonable value of these miscellaneous items.

"13. That subsequent to April 17, 1975, defendant improved said real property and that the reasonable value of said improvement was $1,000.00.

"14. That the reasonable value of said services defendant provided plaintiff beginning in 1964 was $6,000.00, of which $1,500.00 has been paid."

The court concluded that Minnie was entitled to judgment rescinding the agreement and cancelling the deed of April 16, 1975; that Viona was entitled to judgment against Minnie in the sum of $5,500; and ordered judgment to that effect.

The parties are essentially in agreement that the issues on appeal are the following:

(1) Having once ordered reformation, was the trial court justified in ordering rescission?

(2) Does the evidence support a finding of either mistake or undue influence?

(3) Having ordered rescission, did the trial court adequately compensate Viona for services rendered?

After reviewing the briefs and the arguments of the parties, it appears that they agree with the trial court that the important question here is: What is the value of the services rendered by Viona to Minnie? The trial court obviously made a sincere effort to arrive at that determination, once before receiving the accounting and again after receiving it after the death of Minnie. With 20–20 hindsight, this court can see that it would have been better had the trial court ordered an accounting and postponed making findings until after it was received.[4] This would have made it unnecessary to vacate the original judgment and would have furnished the court with all of the facts necessary for a final determination.[5] We do not agree with the finding of the trial court that there was *either* undue influence exercised by Viona upon Minnie *or* a misunderstanding by Minnie as to the agreement of April 16, 1975. Although there was a confidential relationship between the parties, that alone does not constitute a sufficient basis for a finding of undue influence. *Bentson v. Ellenstein*, 215 Minn. 376, 10 N.W.2d 282 (1943). Although Viona asked Minnie to give her the house, there is no evidence that unusual pressure was brought to bear on Minnie to convince her to make the gift. The evidence is that Minnie was in full control of her faculties and able to make decisions regarding her property except for part of the time that she was in the hospital and during a portion of her stay at the Golden Age Rest Home. During the time that Minnie might have been considered incompetent, no transaction took place which might have been considered to be against her best interests. We do agree that there was a misunderstanding between the parties as to the effect of the agreement of April 16, 1975. Minnie thought she was giving the house to Viona as payment for both past and future services, including room and board, while Viona thought she should receive payment for room and board in addition to the house.

If the trial court arrives at a correct decision, that decision should not be overturned regardless of the theory upon which it is based. *Schoeb v. Cowles*, 279 Minn. 331, 336, 156 N.W.2d 895, 898 (1968); 1B Dunnell, Dig. (3 ed.) § 421. The trial court's first decision, which amounted to a reformation of the agreement of April 16, 1975, and an award of future support to Minnie, might have been sustainable had Minnie lived, although it seems to us that the value of the house would have been used up in future support and would have provided Viona with very little compensation for past services. Upon the death of Minnie, of course, the decision became extremely inequitable to Viona.

In any event, we feel that the theory of the second decision, amounting to rescission of the agreement and deed and an award to Viona for services rendered, is more likely to achieve equity between the parties under all of the circumstances. Our only concern is for the adequacy of the award made by the court to Viona. She rendered services to Minnie for a period of 10 years, albeit the services may have been minimal during the first few years. Vio-

---

4. It may be that the trial court felt compelled by Minn.St. 546.27 to make an early decision. That law requires in effect that all matters submitted to a district judge for decision must be decided within 90 days thereafter. Other states have, or have had, similar laws which have been construed in the following cases: *Holliman v. State*, 175 Ga. 232, 165 S.E. 11 (1932); *Talbot v. Collins*, 33 Idaho 169, 191 P. 354 (1920); *State ex rel. Kostas v. Johnson*, 224 Ind. 540, 69 N.E.2d 592, 168 A.L.R. 1118 (1946); *Riglander v. Star Co.*, 98 App.Div. 101, 90 N.Y.S. 772, 181 N.Y. 531, 73 N.E. 1131 (1904); *Sliosberg v. New York Life Ins. Co.*, 217 App. Div. 67, 216 N.Y.S. 215, 244 N.Y. 482, 155 N.E.

749, certiorari denied, 275 U.S. 526, 48 S.Ct. 19, 72 L.Ed. 407 (1927); *Nendel v. Meyers*, 162 Or. 661, 94 P.2d 680 (1939); *Resolute Ins. Co. v. Seventh Judicial D.C. of Okla. Co., Okl.*, 336 F.Supp. 497 (W.D.Okl.1971). See, also, *James v. Appel*, 192 U.S. 129, 24 S.Ct. 222, 48 L.Ed. 377 (1904). Cf. *In re Disbarment of Ithamar Tracy*, 197 Minn. 35, 266 N.W. 88, 267 N.W. 142 (1936); *Wenger v. Wenger*, 200 Minn. 436, 274 N.W. 517 (1937).

5. As it turned out, this would have included the death of Minnie, which could not have been foreseen at the time the trial judge made his first decision.

na's records, although not provably accurate, indicate that she expended over 5,000 hours and traveled over 30,000 miles in behalf of Minnie. While it might be suggested that the trial judge may have thought that some of the $8,284.11 which was unaccounted for might have found its way into Viona's pocket, he made no such finding. On the contrary, he found that the money was spent on miscellaneous items for Minnie and that it was a reasonable amount to spend on such items.

It would appear that there is nothing to be gained by sending the case back to the trial court for a reconsideration of the award to Viona or for a new trial of that issue. Minnie is dead, and it is not likely that there would be any new evidence on the subject.

We have made a thorough examination of the record and are convinced that a more adequate award to Viona would be in the form of an additur in the sum of $4,500, in addition to what she has already received.

Affirmed as to the rescission of the deed and the agreement of April 16, 1975, and remanded to the trial court with directions to enter judgment for defendant in the amount of $10,000.

OTIS and TODD, JJ., took no part in the consideration or decision of this case.