753 P.2d 274

Denton GREENE and Helen Greene, husband and wife, Plaintiffs–Appellants,

v.

TRUCK INSURANCE EXCHANGE; Farmer's Group, Inc., a Nevada corporation, d/b/a Farmers Insurance Group; Leon Henrich and Judy Henrich, husband and wife, individually, and as agents for Farmers Insurance Group, and Does I through X, inclusive, Defendants–Respondents.

No. 16401.

Court of Appeals of Idaho.

March 29, 1988.

Gordon W. Jenkins, Idaho Falls, for plaintiffs-appellants.

W. Marcus W. Nye (Racine, Olson, Nye, Cooper & Budge), Pocatello, for defendants-respondents.

SWANSTROM, Judge.

This is a lawsuit against an insurance company by an insured who claims that the company wrongfully failed to pay a loss covered by his policy. He seeks to recover not only the amount of the loss but also damages for the company's alleged breach of an implied covenant of good faith, its alleged commission of a tort of bad faith, and its alleged violation of the Idaho Unfair Settlement Practices Act. The district court entered summary judgment against the insured on all these issues, leaving him with no recovery. For reasons explained in today's opinion, we uphold the summary judgment as to the covenant of good faith, the tort of bad faith and the statutory violation. But we set aside the judgment

as to the loss claimed by the insured under the policy.

Before stating the facts, we note the standard which governs our review of a summary judgment. Where, as here, a jury trial has been requested, ·

> [t]his court will determine whether a genuine issue of material fact remains to be decided, based on the pleadings and affidavits. In making this determination, we will construe all allegations of fact in the record, ánd all reasonable inferences from the record, in the light most favorable to the party opposing the motion. Upon the facts thus viewed we will determine whether either party was entitled to judgment as a matter of law.

*Hirst v. St. Paul Fire & Marine Ins. Co.,* 106 Idaho 792, 795, 683 P.2d 440, 443 (Ct. App.1984) (citations omitted); *see also* I.R. C.P. 56(c). Accordingly, the facts set forth below are drawn from reading the record in the best light for the insured.

### I

Denton Greene and his wife Helen operate a dairy farm near Weston, Idaho. At times pertinent to this case they held a "peril" policy issued by the Farmers Insurance Group, protecting their business against losses resulting from enumerated causes. This policy included an endorsement providing as follows:

> *Death or Injury by Wild Animals.* Insurance provided hereunder on cattle is extended to include loss resulting from attack by wild animals or dogs (except dogs owned by the insured and dogs on the premises with the knowledge and consent of the insured or an employee of the insured). [Emphasis original.]

Apparently, this endorsement was added when Mr. Greene told the Farmers Insurance agents, Leon and Judy Henrich, that he was concerned about risks posed to his livestock by predatory animals.

Subsequently, on November 22, 1981, this claim arose. The Greenes traveled from the farm to their daughter's house for a social visit. Upon returning to the farm that evening, they found that the dairy cows were outside the corral and were "so upset we couldn't do anything with them." The next morning Mr. Greene discovered that a section of barbed wire fence, supported by five "railroad tie" fence posts, had been flattened. He also found that some of the herd had been "cut up bad" with damage to their udders, chests, and bellies. After another day passed, Greene discovered one of his colts lying dead in a nearby pasture. It had been "eaten from its shoulders out over its neck to its head." From the condition of the corpse, Greene estimated that the colt had been killed on November 22, the same day as the dairy herd incident. Although no predator tracks were found and no sighting had been made, Greene theorized that the death of the colt and the injuries to his cattle had resulted from an attack by a cougar.

Soon thereafter Greene contacted his insurance agents. He filed a claim for the dead colt and, later, for injuries to the cattle. Thirteen cows suffering particularly severe injuries were sold immediately with the agents' approval. After waiting seventeen days for an agent to visit the farm and to verify the colt kill, Greene buried the corpse. No visit by an agent occurred until several weeks later. In the meantime, most of the remaining dairy herd developed mastitis, an inflammation of the udders. The outbreak of mastitis resulted in significant decreases in milk production. Greene added the diminished value of the infected cows to his insurance claim. Eventually, the claim totaled $62,-967, consisting of $13,767 for the loss incurred upon sale of the thirteen cows most badly injured; $20,700 for the reduced value of twenty-eight infected cows who continued to give some milk; and $28,500 for the reduced value of thirty other infected cows who "went dry."[1] Although the claim initially included the value of the

---

1. The claim, as summarized here, contains no item for the loss of income due to reduced milk production. The insurance policy excludes coverage of any such "consequential" loss. The policy also limits recovery on each cow to $500. If this sum were paid on all seventy-one cows encompassed by Greene's claim, the total recovery would be $35,500.

dead colt, this item was dropped when the company noted that the "wild animal" endorsement extended coverage only on "cattle." After a lengthy investigation, described in detail below, the company entertained substantial doubt as to whether a cougar attack really had occurred or, even if it had, whether it had caused the mastitis problem that diminished the value of the dairy herd. The company offered $7,000 to settle the claim, followed by subsequent offers of $10,000 and $25,000. None of these offers was acceptable to Greene. He and his wife sued the company and the insurance agents.

In the pleadings, Greene alleged that the insurance company had breached its contract with him by failing to pay the amount he claimed. He further alleged that the company had acted in bad faith by unduly delaying its processing of the claim and by making unreasonably low offers when the company knew he was in financial distress.

The company moved for summary judgment, acknowledging that the claim had been slowly processed but asserting that the delay was due to extensive inquiry into the dubious factual basis of the claim. The company's inquiry included an investigation conducted under contract by a dairy farming expert from Utah State University. He wrote a comprehensive but somewhat inconclusive report, stating that "something did spook [the] herd" and that a cougar attack was possible. He further stated that whatever "spooked" the cows "probably triggered the mastitis problem . . . [which] was then compounded by the severe winter weather that followed."

The company argued to the district court that no one had seen a cougar or any cougar tracks at the Greene farm on or near the date of the dairy herd incident. Greene countered with affidavits of persons who had seen cougars in the Weston area at various times, affidavits of other dairy farmers who described how cattle typically react to wild animals, and the affidavit of a wildlife expert who opined that the colt kill was uniquely characteristic of cougar behavior.[2] The company contended that there were no claw marks or laceration scars on the cows when they were examined by a veterinarian. Greene countered that the examination occurred five weeks after the alleged attack. The company contended that Greene acted unreasonably in waiting five weeks before obtaining veterinary services.[3] Greene countered that he treated the cows himself in the meantime. The company contended that mastitis could have many possible causes and that Greene's herd had suffered from mastitis before the alleged attack. Greene countered that virtually all dairy herds have some mastitis and that the incidence of the disease in his herd rose dramatically after the attack. In sum, when the summary judgment motion was argued to the district court, the facts and the inferences to be drawn therefrom were hotly disputed.

The district judge concluded that Greene had failed to establish a genuine issue of material fact regarding his loss. The judge likened Greene's claims to "grabbing something out of the sky" and said that the record contained "not one scintilla of evi-

**2.** Several of these affidavits were submitted after the district court had orally granted the insurance company's motion for summary judgment, prompting the Greenes to move for reconsideration. Although the company objected to these affidavits as being untimely, the judge allowed them and apparently considered them in making his final decision. A court possesses discretionary authority to consider tardily filed affidavits. *See generally* 10A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2719 (1983).

**3.** The company has pointed to the delay in securing veterinary assistance, not only to cast doubt upon Greene's allegation that the mastitis was caused by a cougar attack, but also to show that Greene failed to mitigate his loss. The company has contended that mastitis can be effectively treated, if promptly diagnosed, for no more than $200 per cow. This contention has not been specifically refuted. Greene simply argues that he acted reasonably in attempting to treat the mastitis himself. Failure to mitigate may be a valid defense to an insurance claim. *See generally* ANNOTATION, *Injured or Ill Animals—Insured's Duties*, 22 A.L.R. 4th 1053 (1983). However, that defense relates to the amount of compensable loss, not to the threshold question of liability under the policy. That threshold question is the issue before us today.

dence to substantiate the allegations of the Plaintiff's [sic] Complaint." Judgment was entered against Greene on all issues.

■ With due respect to the district judge, we believe he mischaracterized the evidence relating to Greene's loss. Although the evidence was slim and circumstantial, it was sufficient to establish genuine issues of material fact regarding the existence of a cougar attack and the effect of such an attack upon the dairy herd. Greene's own affidavit and deposition set forth his personal observations of the dairy herd's behavior, the damaged fence, and the dead colt. Individuals experienced with wild animals and dairy cows correlated these facts with a possible cougar attack. The record contained expert opinions that mastitis could have resulted from the attack.

In *Qualls v. Farm Bureau Mut. Ins. Co.*, 184 N.W.2d 710 (Iowa 1971), the Iowa Supreme Court examined a similar claim under an insurance policy with coverage for wild animal attacks. The court held that observation of bites or wounds was not necessary to prove an "attack." The Iowa court was satisfied that the word "attack," as used in the insurance policy, embraced wild animal behavior producing injury to livestock, despite the lack of physical or other direct evidence. Here, construing all disputed facts and legitimate inferences in favor of Greene, we hold that the trial court erred in granting summary judgment on his claim of loss. Whether a wild animal attack occurred, and whether the mastitis problem was proximately caused by the attack, are genuine questions of fact to be decided by a jury.

## II

Next we examine Greene's claim for damages in addition to the loss covered by the policy. As mentioned earlier, Greene contends that the company breached an implied covenant of good faith, committed a tort by acting in bad faith, and in so doing also violated Idaho's Unfair Settlement Practices Act. Because the issues relating to the implied covenant of good faith and the tort of bad faith are closely related, we will discuss them together.

### A

As might be inferred from the terminology, a nexus exists between an allegation that an insurance company has breached a contractual obligation to settle claims in good faith and an allegation that the company has committed a tort by acting in bad faith. One who acts in bad faith obviously lacks good faith. Indeed, our Supreme Court has been deeply divided on whether a separate tort should be recognized upon facts constituting a contractual breach. In *White v. Uniguard Mutual Insurance Co.*, 112 Idaho 94, 730 P.2d 1014 (1986), a majority of the Court held that a separate tort does exist. The majority declared that there is a fiduciary, as well as contractual, relationship between an insurance company and its insured. The majority also noted that the scope of available damages is broader in tort than in contract because tort damages are limited only by the principle of proximate cause and not by the additional constraint of reasonable foreseeability when the contract was made.

The majority's apparent objective in *White* was to establish a cause of action affording the insured the fullest possible remedy for insurance company misconduct. Nowhere in *White* did the majority differentiate between conduct breaching a covenant of good faith and conduct constituting a tort of bad faith. Accordingly, we presume that the conduct is the same. The choice between causes of action turns on the remedy sought. The conduct giving rise to either form of action is described in *White* as an intentional and unreasonable denial or delay in payment of a claim. The Court elaborated as follows:

> Of course the mere failure to immediately settle what later proves to be a valid claim does not of itself establish "bad faith." As indicated earlier, the insured must show the insurer "intentionally and unreasonably denies or delays payment...." [Citation omitted.] An insurer does not act in bad faith when it challenges the validity of a "fairly debatable" claim, or when its delay results

from honest mistakes. [Citation omitted.]

112 Idaho at 100, 730 P.2d at 1020.

██ In the present case, the insurance company has performed the tasks imposed upon it by the express terms of the insurance policy. It has acknowledged a claim, has investigated the claim, and has offered payment based on its evaluation of the claim. However, Greene contends that these tasks have been performed in such dilatory fashion, and that the offers of payment have been so inadequate, bad faith has been demonstated. We disagree. Although the investigation consumed several months, and might well have been conducted more expeditiously, the record is devoid of any indication that the company intended to achieve delay for delay's sake. Rather, the record—including extracts from the company's claim file—demonstrates beyond dispute that the company's representatives were concerned about the unique nature of the claim and about the sparseness of verifiable facts to support Greene's theory that a cougar attack produced his dairy herd's mastitis.

██ In our view Greene's claim was, and is, "fairly debatable" within the meaning of *White*. Although the district judge did not have the benefit of the *White* decision when he entered summary judgment, we conclude that he nevertheless ruled correctly as a matter of law. The record fails to establish a genuine issue of material fact relating to the covenant of good faith or the separate tort of bad faith.[4] *Compare Sparks v. Republic National Life Insurance Co.*, 132 Ariz. 529, 647 P.2d 1127, 1137 (1982), *cert. denied*, 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (company's awareness of "staggering" medical bills combined with denial of claim on basis of "patently ambiguous" and undisclosed provisions of policy held sufficient to establish jury question on bad faith); *Beck v. Farmers Insurance Exchange*, 701 P.2d 795 (Utah 1985) (summary judgment for insurer overturned where delay was unexplained, no evidence of investigation was presented by insurer, and expert on claims adjustment stated that delay had been in bad faith).

## B

██ Greene also asserts that the insurance company's delays and inadequate offers violated I.C. § 41–1329. This statute, often called the Idaho Unfair Claim Settlement Practices Act, is part of a larger statutory scheme known as the Trade Practices Law, comprising Chapter 13, Title 41, Idaho Code. Section 41–1329 enumerates certain prohibited practices, including refusal to pay claims without conducting reasonable investigations and failing in good faith to effectuate settlement of claims on which liability has become reasonably clear.

The facts in this case would afford a tenuous basis to find a violation of section 41–1329. However, we need not make a definitive ruling on that question. In *White v. Uniguard Mutual Insurance Co., supra*, our Supreme Court—after holding that a tort of bad faith exists in Idaho—went on to declare that private remedies under the Idaho Unfair Claim Settlement Practices Act are unnecessary and, therefore, will be deemed not to exist. Thus, as interpreted by our Supreme Court, section 41–1329 may furnish grounds for administrative action against an insurance company, or for the government to seek judicial relief from certain unfair practices, but it "does not give rise to a private right of action whereby an insured can sue an insurer for statutory violations committed in

---

4. By parity of reasoning, we also reject Greene's contention that the insurance company's conduct warrants an imposition of punitive damages. To recover punitive damages for denial of an insurance claim, the insured must show (1) that the company initially refused to pay a valid claim, (2) that the company's refusal to make prompt payment was an extreme deviation from reasonable standards of conduct, and (3) that this extreme deviation occurred with an understanding of the probable consequences. *Linscott v. Rainier National Life Insurance Co.*, 100 Idaho 854, 606 P.2d 958 (1980); *see also Cheney v. Palos Verdes Inv. Corp.*, 104 Idaho 897, 665 P.2d 661 (1983). Here, because Greene's claim was "fairly debatable," we deem it clear that the company's refusal to pay the claim promptly was not "an extreme deviation from reasonable standards of conduct."

connection with the settlement of the insured's claim." *White*, 112 Idaho at 101, 730 P.2d at 1021. Accordingly, we conclude that the district court correctly entered summary judgment on this issue as well.

### III

Anticipating the possibility of a remand, the insurance company has asked us to furnish guidance on a theory of "constructive trust" advanced by Greene, on the policy's exclusion of "consequential" losses, and on the appropriateness of keeping the insurance agents in the case as named defendants. We will comment briefly on each point.

Greene has not pressed his constructive trust theory on appeal. That theory, as articulated in the district court, appears simply to be a variation upon the argument that Greene is entitled to recover all amounts due and owing under the policy. We fail to see how the doctrine of constructive trust, which generally is viewed as a remedy rather than as a theory of liability, sheds any additional light upon the district court's determination of the loss compensable under the policy.

■ As we observed in footnote 1, *supra*, the policy excludes coverage of any "consequential" loss. Unless this exclusion was waived by an agent's contrary representation concerning scope of coverage, it would bar recovery of income lost due to reduced milk production. However, it would not preclude recovery for the diminished value of the cows in light of their impaired productive capacity. We believe this is a direct, rather than "consequential," loss. *Cf. Preston v. National Grange Mut. Ins. Co.*, 114 N.H. 212, 317 A.2d 787 (1974) (cows no longer able to give milk may be deemed "destroyed" within the meaning of insurance policy because they are useless for their intended purpose).

■ With respect to the status of the insurance agents in this case, it is clear that they would have no personal liability for any sum eventually found due under the policy. Such liability rests upon the insurance company, which is bound by contracts made, as well as any representations made, by its agents within the scope of their express, implied, or apparent authority. *Huppert v. Wolford*, 91 Idaho 249, 420 P.2d 11 (1966). However, Greene's complaint against the agents apparently is grounded upon independent representations allegedly made by them, perhaps in excess of their authority. Although the precise nature of such representations is unclear, the record concerning this issue is poorly developed on both sides. Moreover, while the company has stated orally that it is prepared to accept liability for any acts of the agents, our attention has not been called to such a stipulation in the record. Accordingly, we leave to the district court on remand the task of determining, upon a fuller record, whether a genuine reason exists to keep the agents in the case as named defendants.

In conclusion, we vacate the district court's summary judgment insofar as it disallows recovery of Greene's claimed loss under the policy. The case is remanded for further proceedings on that issue. We affirm the judgment on the issues of breach of an implied covenant of good faith, commission of a tort of bad faith, and violation of I.C. § 41–1329. Costs to appellants Greene. No attorney fees on appeal are awarded at this time; however, if Greene prevails on remand, the district court shall make an award under I.C. § 41–1839, including a reasonable amount for the appeal, to compensate for legal services required to obtain payment of the loss covered by the policy.

WALTERS, C.J., and BURNETT, J., concur.