**WITCHER CONSTRUCTION COMPANY, Appellant,**

v.

**SAINT PAUL FIRE AND MARINE INSURANCE COMPANY, a Minnesota capital stock company, Respondent.**

No. C1–96–71.

Court of Appeals of Minnesota.

June 11, 1996.

Review Denied Aug. 20, 1996.

Dean B. Thompson, Steven C. Cox, Fabyanske, Svoboda, Westra & Hart, P.A., Minneapolis, for Appellant.

Joseph L. Lulic, Michael M. Carter, Hanson Lulic & Krall, Minneapolis, for Respondent.

Considered and decided by LANSING, P.J., and SHORT and WILLIS, JJ.

## OPINION

SHORT, Judge.

A natural gas explosion occurred several blocks from a construction site, prompting Witcher Construction Company to suspend operations for nearly a month while experts tested the structure for harm. Although the building sustained no physical damage, Witcher filed a claim under its all-risk property insurance policy for the costs associated with the temporary interruption of construction. Citing the absence of physical loss to the insured property and an exclusion for

delay and loss of use, Saint Paul Fire and Marine Insurance Company (insurer) denied Witcher's request for coverage. Witcher brought this action to establish its right to coverage, and both parties moved for summary judgment. The trial court concluded the policy generally requires indemnification of Witcher's mitigation costs, but the exclusion bars recovery of those expenses related to the consequences of delay. The court determined Witcher could recover out-of-pocket contributions for examination of the site, but not the lost construction opportunities. On appeal, Witcher argues the trial court erred as a matter of law by not finding business interruption coverage under (1) the main insuring clause, (2) the Minnesota fire endorsement, and (3) its contractual and common law mitigation duties.

## FACTS

On July 22, 1993, Witcher was working on a construction project in St. Paul. Early that morning, a natural gas explosion occurred three blocks south and one block east of the project. Although Witcher perceived no obvious damage and continued operations throughout that day, it decided to suspend work the following day until experts could determine whether the structure had sustained nonobvious harm. Because Witcher lacked the skills necessary to undertake a proper investigation, its client arranged for consultants to examine the structure. After the experts conclusively established the absence of physical damage, Witcher resumed operations on August 19.

The suspension of work caused Witcher significant economic loss, because of idle equipment and workers and the subsequent extension of the project into winter. Seeking compensation for these losses, Witcher filed a claim under three clauses of an insurance contract, which provides (1) "protect[ion of the] insured property against risks of direct

physical loss or damage except as excluded," (2) "insur[ance of the] covered property against all loss or damage caused by fire," and (3) reimbursement for the insurer's share of reasonable and necessary expenses incurred "to protect the property from further damage" when a covered loss occurs.

## ISSUES

I.   Is Witcher entitled to coverage under the main insuring clause?

II.  Is Witcher entitled to coverage under the Minnesota fire endorsement?

III. Is Witcher entitled to indemnification for mitigation efforts either under the policy or pursuant to general principles of law and equity?

## ANALYSIS

In reviewing an order for summary judgment that construes the text of an insurance policy, we determine whether the trial court erred in its interpretation of the document's language. *See State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990) (reviewing a summary judgment order for genuine issues of fact and errors of law). In construing Witcher's policy, we apply three principles of insurance law. First, coverage is determined by the interaction of clauses relating to the policy's subject matter, the insured causes of loss, and limitations on the insurer's liability for the consequences of an otherwise insured event. *See* Robert E. Keeton, *Basic Insurance Law* 292 (1960) (identifying seven coverage provisions).

Second, consequential loss embraces both principles of attenuated causation of harm to the insured subject matter, which an underwriter must exclude from coverage to avoid liability, and the broader consequences of property damage, such as business interruption and lost profits,[1] which first-person property insurance does not generally cover.[2]

---

**1.** We distinguish this from irreparable economic loss *to the insured subject matter*, which is not a consequential loss. *See, e.g., Boyd Motors, Inc. v. Employers Ins.*, 880 F.2d 270, 273–74 (10th Cir. 1989) (concluding that the residual diminution in value of a dealer's hail-damaged cars was a direct loss to the insured subject matter and not an excluded consequential loss); Keeton, *supra*, at

138 (noting that property insurance does not protect against business interruption, but covers economic damage to the insured property).

**2.** A different rule applies to liability insurance. *See Aetna Casualty & Sur. Co. v. General Time Corp.*, 704 F.2d 80, 83 (2d Cir.1983) (finding coverage for lost profits when coupled with prop-

**4**

*Compare* 2 Warren Freedman, *Richards on the Law of Insurance* § 210, at 718–19 (5th ed. 1952) (examining both indirectly-caused property damage and business losses in a discussion of consequential loss and noting that first-person property insurance does not usually cover indirect loss, but recognizing that many courts treat indirectly *caused* loss as nonconsequential loss) *and Lipshultz v. General Ins. Co. of Am.*, 256 Minn. 7, 13–15, 96 N.W.2d 880, 884–86 (1959) (concluding the causation element of consequential loss is presumptively covered absent a specific exclusion) *with* 15 Mark S. Rhodes, *Couch on Insurance* 2d §§ 54:1, 54:177, 54:179, 54:181, at 414, 563, 565, 567 (rev. ed. 1983) (noting that fire insurance establishes the paradigm for recovery on first-person property insurance and explaining that lost profits, business interruption, and loss of use are not available unless the insurance policy expressly covers these items).

■ And third, while all-risk insurance represents a modified procedure for identifying and proving the occurrence of insured events, the holder of such a policy must still demonstrate a loss to the insured subject matter. *See* Keeton, *supra*, at 270–72 (describing the difference between all-risk and named-peril insurance as "a contrast in tendency" and explaining the two differ mainly in the procedures for designating and proving the occurrence of insured events); *see also Nevers v. Aetna Ins. Co.*, 14 Wash.App. 906, 546 P.2d 1240, 1241 n. 1 (1976) (requiring proof of loss to the insured property); John P. Gorman, *All Risks of Loss v. All Loss: An Examination of Broad Form Insurance Coverages*, 34 Notre Dame Law. 346, 346–47 (1959) (noting the temptation to equate all-risk with all-loss, but suggesting this represents an uninformed understanding). *But see Stanley v. Onetta Boat Works, Inc.*, 303 F.Supp. 99, 106 (D.Or.1969) (finding coverage for lost profits and loss of use un-

der an all-risk builder's policy), *aff'd*, 431 F.2d 241 (9th Cir.1970).

**I.**

■ Witcher argues the contractual obligation to "protect the insured property" indemnifies it for all expenses incurred "with respect to the property." *Cf. Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co.*, 256 Minn. 404, 413–14, 98 N.W.2d 280, 288 (1959) (explaining that fire insurance policies are personal indemnity contracts). A purpose of insurance is to indemnify policyholders, but insurance contracts qualify this obligation by defining the insured subject matter. *See* Keeton, *supra*, at 292 (noting the policy's subject matter is a coverage provision).

■ Witcher's policy describes its ***property*** as the insured subject matter. Contrary to Witcher's assumption, this clause does not mean that Witcher enjoys the right to indemnification for all expenses incurred "with respect to" the property. Rather, in the absence of specific language covering business interruption, loss of use, or lost profits, the designation of Witcher's property as the insured subject matter limits coverage to the physical and economic damage done to that property. *See* 15 Rhodes, *supra*, §§ 54:1, 54:177, 54:179, 54:181, at 414, 563, 565, 567 (describing fire insurance as the model for recovery on first-person property insurance and explaining that coverage of such losses is not available unless the policy expressly includes them); *see also* Keeton, *supra*, at 138 (noting that property insurance covers economic damage to the insured property, but not business interruption and similar phenomena, which are separately-insurable interests).

Based on the policy's subject matter, we conclude that coverage does not extend to

erty loss under a liability policy). This distinction arises from the fact that liability insurance protects against the insured's own wrongful behavior, which may trigger damages for loss of use. *See State Farm Fire & Casualty Co. v. Superior Court*, 215 Cal.App.3d 1435, 264 Cal.Rptr. 269, 273 (1989) (quoting *Garvey v. State Farm Fire & Casualty Co.*, 48 Cal.3d 395, 257 Cal.Rptr. 292, 298, 770 P.2d 704, 710 (1989), for the

proposition that liability insurance provides broader protection than first-person property insurance and is designed to cover the effects of the insured's own tortious behavior); *In re Commodore Hotel Fire & Explosion Cases*, 324 N.W.2d 245, 250 (Minn.1982) (recognizing that damages for tortious harm to chattels include compensation for loss of use).

indemnification of Witcher's business interruption losses. Our decision is supported by the policy's rules for loss adjustment, which set coverage at the replacement value of new construction and the actual cash value of old construction. *See Teeples v. Tolson*, 207 F.Supp. 212, 215 (D.Or.1962) (noting that an all-risk policy's "actual value" clause demonstrated the parties' intent to cover only the cost of restoring a building to its original state and not the added cost of redesigning it following its collapse); *Kingsley v. Spofford*, 298 Mass. 469, 11 N.E.2d 487, 491 (1937) (quoting *Hewins v. London Assurance Corp.*, 184 Mass. 177, 68 N.E. 62, 63 (1903), and concluding that a fire policy's limitation to actual cash value prevented coverage for interruption of business and lost profits).

Witcher also argues the phrase "risks of direct physical loss or damage" is ambiguous and can be read to cover either the chance (risk) of direct physical loss or any kind of damage. This argument is contrary to the weight of authority. *See Teeples*, 207 F.Supp. at 213 n. 2, 215 (finding similar language "clear and unambiguous"); *Glens Falls Ins. Co. v. Covert*, 526 S.W.2d 222, 223 (Tex.Civ.App.1975) (describing similar language as "clear"), *error refused* (Tex. Oct. 29, 1975); *Nevers*, 546 P.2d at 1241 (finding no ambiguity in similar language); *see also Boyd Motors, Inc. v. Employers Ins.*, 880 F.2d 270, 271, 274 (10th Cir.1989) (stating the express purpose of a similar policy was to guarantee equivalent replacement or complete repair of physical damage to the insured property); *Great N. Ins. Co. v. Benjamin Franklin Fed. Sav. & Loan Ass'n*, 793 F.Supp. 259, 263 (D.Or.1990) (construing similar language as a "straightforward matter of contract interpretation"), *aff'd*, 953 F.2d 1387 (9th Cir.1992). *But see Hampton Foods, Inc. v. Aetna Casualty & Sur. Co.*, 787 F.2d 349, 352 (8th Cir.1986) (affirming the trial court's conclusion that a similar policy was ambiguous).

In *Hampton Foods*, the insured grocery store held a policy covering its inventory against "loss of or damage to the property * * * resulting from all risks of direct physical loss." 787 F.2d at 351. In an unpublished order, the trial court concluded this language was vague and interpreted it to mean "loss or damage due to the *danger* of direct physical loss." *Id.* at 351–52. The Eighth Circuit affirmed this construction, but noted that the policy did not cover every risk of loss and emphasized that the case involved certain physical harm to the insured property, which the insured prevented by heroic mitigation efforts. *Id.* at 352. Thus, the Eighth Circuit narrowed the trial court's interpretation to apply to situations in which physical loss of the insured subject matter has become certain due to the actual destruction of surrounding property. Such a limited rule is consistent with the presumption of coverage for the "causation" element of consequential loss, but does not justify coverage under the facts at bar. *Cf. Lipshultz*, 256 Minn. at 14–15, 96 N.W.2d at 885–86 (finding presumptive coverage for loss by windstorm, which did not cause immediate harm to a grocery's inventory, but which interrupted power and caused the food to deteriorate).

Assuming we accepted Witcher's construction, as supported by the trial court's decision in *Hampton Foods*, Witcher still cannot demonstrate its entitlement to coverage for business interruption because the phrase "risks of physical loss or damage" refers only to the insured event. Witcher still must connect this to the insured subject matter, which is its property and not the continuity of its business operations. *See Nevers*, 546 P.2d at 1241 n. 1 (explaining that the holder of an all-risk policy must demonstrate loss or damage to the insured subject matter); *Gorman, supra*, at 355 (same); *see also Hampton Foods*, 787 F.2d at 351 (noting the insured purchased both all-risk property and business interruption coverage).

■ Even if Witcher succeeded in establishing coverage under the main insuring clause, we would still need to interpret the effect of the policy's exclusion of "loss caused by delay, loss of market, loss of use, or any indirect loss." Witcher argues that principles of concurrent causation preclude the application of this exclusion to deny coverage because, even if the loss was caused by delay, it also was the proximate result of an insured event, the explosion. *See Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins.*

Co., 383 N.W.2d 645, 653 (Minn.1986) (finding coverage when both included and excluded causes contributed to the loss). However, while exclusions technically relate to insured events and, thus, involve the *cause* of loss, *this* "exclusion" substantively embodies a contractual limitation on the insurer's liability for the *consequences* of an otherwise insured loss. *See* Keeton, *supra*, at 292 (listing various coverage provisions, such as exclusions and limitations on responsibility for the consequences of an insured event). Thus, principles of dual causation are inapplicable to this type of "exclusion," which explains its regular application to defeat claims for the type of business loss experienced by Witcher.[3] *See, e.g., Boyd Motors,* 880 F.2d at 274 (construing an all-risk policy and noting most courts interpret similar exclusions to prevent coverage for indirect or consequential economic loss); *Blaine Richards & Co. v. Marine Indem. Ins. Co.,* 635 F.2d 1051, 1052, 1056 (2d Cir.1980) (interpreting an all-risk policy and concluding the insured could recover the expense of remediating contamination, but that a similar exclusion barred recovery of market losses resulting from the delay); *Stanley,* 431 F.2d at 243 (Koelsch, J., concurring, and arguing underwriter's liability flowed not from the all-risk policy, which excluded consequential losses, but from the insurer's tortious behavior); *Interpetrol Bermuda, Ltd. v. Lloyd's Underwriters,* 588 F.Supp. 1199, 1202 (S.D.N.Y.1984) (suggesting that a "general delay clause" could defeat coverage for loss of market under an all-risk policy); *Twin City Hide v. Transamerica Ins. Co.,* 358 N.W.2d 90, 92 (Minn.App.1984) (applying an all-risk property policy's exclusion of consequential damages to defeat coverage for the expense of maintaining custom-

er goodwill); *see also Greene v. Truck Ins. Exch.,* 114 Idaho 63, 753 P.2d 274, 276 n. 1 (App.1988) (noting an exclusion of consequential loss prevented coverage for lost income under a named-peril policy), *review denied* (Idaho Jan. 31, 1989); *Riefflin v. Hartford Steam Boiler Inspection & Ins. Co.,* 164 Mont. 287, 521 P.2d 675, 677–78 (1974) (same); *cf. Borden, Inc. v. Howard Trucking Co.,* 425 So.2d 893, 897 & n. 4 (La.Ct. App.1983) (applying a similar exclusion and denying coverage for lost production under a liability policy), *aff'd in relevant part,* 454 So.2d 1081, 1085, 1091 (La.1983).

## II.

■ To comply with Minnesota law, Witcher's policy carries an endorsement that "insure[s] covered property against all loss or damage caused by fire." *See* Minn.Stat. § 65A.01, subds. 3, 3a, 3b (1994 & Supp.1995) (governing the basic content of fire insurance policies). Although Witcher correctly perceives a difference between the endorsement's protection against "all loss" and the policy's coverage of "direct physical loss," the insured subject matter remains Witcher's property and not the continuity of its business operations. *See* 10A, 15 Rhodes, *supra,* §§ 42:28, 54:177, 54:179, 54:181, at 169, 563, 565, 567 (explaining that a "policy insuring against losses by fire will cover every loss * * * to the insured property," and noting that fire insurance does not usually cover lost profits, business interruption, or loss of use unless the policy provides otherwise). The shift from "direct physical loss" to "all loss" does not alter the basic nature of Witcher's property coverage, but clarifies the type of

---

**3.** We recognize that, in the abstract, this type of exclusion serves little purpose in a policy for first-person property insurance. However, practical considerations support their use. First, they provide an obvious bar to coverage and dispense with the need to undertake a broader examination of the policy's subject matter. *See* cases cited after this note (focusing on exclusions rather than insured subject matter). Second, these clauses may provide a second line of defense against the temptation to employ an expansive interpretation of all-risk policies. *See Stanley,* 303 F.Supp. at 106 (assuming that all-risk property insurance covers lost profits and loss of use), *aff'd,* 431 F.2d at 242–43 (same); *see also*

*Interpetrol Bermuda, Ltd. v. Lloyd's Underwriters,* 588 F.Supp. 1199, 1202–03 & n. 16 (S.D.N.Y. 1984) (relying on *Stanley* for the proposition that all-risk insurance provides broader coverage than liability insurance, but recognizing exclusions as a means of limiting this coverage). And third, underwriters may harbor a residual fear that judicial recognition of presumptive coverage for the "causation" element of indirect loss could be extended to its "consequences" element. *See Stanley,* 303 F.Supp. at 106 (relying on a theory of proximate cause to justify the refusal to apply an exclusion of consequential loss), *aff'd,* 431 F.2d at 242–43 (same).

damage the insured property must suffer in order to trigger coverage. *See Marshall Produce*, 256 Minn. at 413–14, 98 N.W.2d at 287–88 (construing the statutory language and noting it covers a loss in value of the physically undamaged, but unmarketable, insured subject matter). The policy's loss-adjustment rules, which set coverage at the replacement value of new construction and the actual cash value of old construction, support this conclusion. *See Kingsley*, 11 N.E.2d at 491 (quoting *Hewins*, 68 N.E. at 63, and deciding that a fire policy's limitation to actual cash value prevented coverage for interruption of business and lost profits). Thus, even if Witcher could demonstrate the occurrence of an insured event (fire), coverage would not extend to its business interruption losses.

█ Witcher's attempts to establish the occurrence of an insured event are similarly unavailing. Although Witcher correctly notes that a combustion explosion is a manifestation of fire, and generally merits coverage, a different rule applies if the combustion explosion occurs at a substantial distance from the insured structure, which suffers concussion damage but is never exposed to the dangers generally associated with fire. *Compare German Baptist Tri–County Mut. Protective Ass'n v. Conner*, 64 Ind.App. 293, 115 N.E. 804, 806 (1917) (noting that fire policies generally cover combustion explosions in the absence of an exclusion) *with Caballero v. Home Mut. Ins. Co.*, 15 La. Ann. 217, 217–18 (1860) (denying coverage under a fire policy because of the distance between the explosion and the insured property and doubting that the parties' reasonable expectations included reimbursement for pure concussion damage) *and Bird v. St. Paul Fire & Marine Ins. Co.*, 224 N.Y. 47, 120 N.E. 86, 86–88 (1918) (Cardozo, J.) (same). Here, the explosion occurred at a considerable distance from the construction site, which was never exposed to the perils normally associated with fire. The fire endorsement is not designed to cover situations involving only intense vibration. *See Heuer v. Northwestern Nat'l Ins. Co.*, 144 Ill. 393, 33 N.E. 411, 412 (1893) (noting an English court made this distinction at one-half mile); *Caballero*, 15 La. Ann. at 217 (making this distinction at

180–200 feet); *Bird*, 120 N.E. at 86–88 (same, at 1,000 feet).

█ Witcher further argues the policy's exclusion of indirect loss does not affect the separate coverage provided by the fire endorsement. *See Dairyland Ins. Co. v. Implement Dealers Ins. Co.*, 294 Minn. 236, 245, 199 N.W.2d 806, 811 (1972) (noting an endorsement must prevail in the event of a conflict with the main policy). However, the policy's exclusion of business losses due to delay manifests no tension with the fire endorsement's promise of indemnity for physical and economic loss to the insured property. *See Wyatt v. Wyatt*, 239 Minn. 434, 438, 58 N.W.2d 873, 876 (1953) (finding no conflict with an endorsement and applying the policy's exclusion).

### III.

█ Witcher's policy requires it to "do everything possible to protect the property from further damage" upon the occurrence of a covered loss and promises to reimburse Witcher for the insurer's share of such expenses. This language is similar to a sue and labor clause, which provides a form of indemnity separate from the main insuring clause and requires the insured to take steps to prevent or minimize an imminent covered loss. *See* 15 Rhodes, *supra*, § 54:175, at 562 (noting mitigation requirements may be set forth in a sue and labor clause); *see also American Home Assurance Co. v. J.F. Shea Co.*, 445 F.Supp. 365, 369 (D.D.C.1978) (discussing the function of this separate coverage); *Southern Cal. Edison Co. v. Harbor Ins. Co.*, 83 Cal.App.3d 747, 148 Cal.Rptr. 106, 111–12 (1978) (same). Because this provision primarily benefits the insurer by limiting its exposure to liability, the insurer must reimburse the insured for the costs of mitigation, even if the policy would not otherwise cover those expenses. *See, e.g., J.F. Shea Co.*, 445 F.Supp. at 369 (noting a sue and labor clause provides separate coverage for the underwriter's benefit, to which the policy's deductible does not apply).

The mitigation requirement of Witcher's policy differs from a typical sue and labor clause in one respect: it requires no action

until a covered loss has already occurred. The insurer seizes on this distinction and argues Witcher had no contractual obligation to mitigate because it experienced no covered loss. *See Thornewell v. Indiana Lumbermens Mut. Ins. Co.,* 33 Wis.2d 344, 147 N.W.2d 317, 321 (1967) (denying coverage under a similar clause because. no covered loss had occurred). But this does not alter either Witcher's common law duty to prevent harm to the insured property or the insurer's corresponding obligation to reimburse Witcher for those efforts. *See Southern Cal. Edison,* 148 Cal.Rptr. at 111, 113 (noting a sue and labor clause merely sets forth implied duties); *Harper v. Pelican Trucking Co.,* 176 So.2d 767, 773 (La.Ct.App.1965) (finding an implied obligation to indemnify the insured for prevention of covered loss to the insured property). Thus, the trial court properly held the insurer accountable for its share of any reasonable and necessary costs of preventing an imminent covered loss to the insured property.

■ Witcher argues the trial court erred by applying the policy's exclusion to its claim for reimbursement of mitigation costs. We agree that the policy's exclusions do not limit the form of expenses that are reimbursable, provided the insured directs its efforts primarily at preventing an imminent covered loss.[4] *See Wilson Bros. Bobbin Co. v. Green,* 1917 K.B. 860, 862–63 (1916) (holding a delay exclusion had no effect on the indemnification available under a sue and labor clause); *see also J.F. Shea Co.,* 445 F.Supp. at 369 (concluding that a policy's deductible does not apply to indemnification under a sue and labor clause). *But see Southern Cal. Edison,* 148 Cal.Rptr. at 112–13 (purporting to disallow indemnification under a sue and labor clause because the means of preservation were the subject of an exclusion, but perhaps responding to the fact that the insured's efforts simultaneously cured a more serious noncovered defect, which would have prevented it from demonstrating that it acted primarily for the insurer's benefit).

The exclusion's inapplicability does not resolve the matter, but requires us to decide if Witcher incurred its losses primarily for the benefit of the insurer by preventing an immediate covered loss to the insured property. *See Southern Cal. Edison,* 148 Cal.Rptr. at 112–13 (explaining the insured may seek reimbursement only for benefits inuring directly and primarily to the insurer); *see also Brecht v. Schramm,* 266 N.W.2d 514, 520 (Minn.1978) ("If the trial court arrives at a correct decision, that decision should not be overturned regardless of the theory upon which it is based."). Because Witcher's client paid for expert evaluation of the structure's integrity, we need not review the trial court's conclusion that Witcher should receive indemnification for monetary contributions to that study. However, we note the obligation to prevent and mitigate covered losses does not always justify reimbursement for the cost of determining the extent of loss. *Compare Reliance Ins. Co. v. McGrath,* 671 F.Supp. 669, 675 (N.D.Cal.1987) (recognizing a timely inspection may constitute part of the insured's implied duty to mitigate a covered loss) *with Cory v. Boylston Fire & Marine Ins. Co.,* 107 Mass. 140, 149 (1871) (holding a sue and labor clause would not justify reimbursement under circumstances in which the insured perceived a loss, had already removed the insured subject matter from immediate peril, and incurred costs in determining the extent of loss as part of the damage-remediation process) *and People v. Globe & Rutgers Fire Ins. Co.,* 96 Cal.App.2d 571, 216 P.2d 64, 67–68 (1950) (same, noting the remediation of losses is not covered by the sue and labor clause, but by the main insuring provisions relating to the cost of repair).

■ Assuming, as the parties do, that the cost of expert testing of the site was a reimbursable mitigation expense, we examine whether Witcher's additional mitigation "expenses" were tied **closely** to preservation of the insured property. *International Com-*

---

4. However, we emphasize that while exclusions place no direct limitations on the insured's choice of mitigation techniques, they do affect the insured's obligation to prevent or mitigate harm, which does not arise until the insured subject matter is threatened by a covered loss. *E.g., J.F. Shea Co.,* 445 F.Supp. at 367 n. 5. Thus, if the prevented loss falls within an exclusion, the insured has no right to indemnity for its efforts.

*modities Export Corp. v. American Home Assurance Co.*, 701 F.Supp. 448, 454 (S.D.N.Y.1988), *aff'd*, 896 F.2d 543 (2d Cir. 1990); *see also Gloucester Ins. Co. v. Younger*, 10 F. Cas. 495, 498, 501 (C.C.D.Mass. 1855) (No. 5,487) (suggesting the indemnification available under a sue and labor clause extends only to the cost of removing insured property from immediate peril); 2 Freedman, *supra*, § 344, at 1128 (noting a sue and labor clause "is strictly confined to the cost of efforts made to save the thing insured"). For example, an all-risk policy's sue and labor clause provides indemnity for the rental cost of equipment if its direct function is to prevent further loss. *Einard LeBeck, Inc. v. Underwriters at Lloyd's of London, Eng.*, 224 F.Supp. 597, 598 (D.Or.1963). But, the rental value of a contractor's idle equipment is not an "expense" recoverable under the sue and labor clause because this "cost" plays no direct role in safeguarding the insured subject matter from immediate harm. *Id.* at 598–99.

We conclude the "costs" of Witcher's idle work force and equipment, as well as the added "expense" of winter construction, do not bear a sufficiently direct relation to the preservation of insured property to justify reimbursement under the common law right to indemnity for mitigation expenses. Because we decline to convert this equitable principle into a latent business interruption policy, we affirm the grant of summary judgment.

### DECISION

Absent explicit language, first-person property insurance does not provide business interruption coverage. Witcher's loss of profit due solely to a temporary construction delay caused by a gas explosion several blocks away is not a covered risk. The trial court properly granted summary judgment in favor of the insurer.

**Affirmed.**